[No. D046763. Fourth Dist., Div. One. July 3, 2007.]

THE PEOPLE, Plaintiff and Appellant, v.
DAVID ANDREW BOYSEN, Defendant and Respondent.

COUNSEL

Bonnie M. Dumanis, District Attorney, Kim-Thoa Hoang, Catherine Stephenson, Craig E. Fisher and James E. Atkins, Deputy District Attorneys, for Plaintiff and Appellant.

Daniel G. Davis, Dennis A. Fischer and Steven Graff Levine for Defendant and Respondent.

OPINION

**BENKE, J.**—In 1980 Elsie Boysen (Elsie) and her husband Robert Boysen (Robert) were murdered. In May 2004 their son, defendant David Andrew Boysen (David), was charged with the crimes. David sought and the trial court granted dismissal based on preaccusation delay. The People appeal, arguing the trial court applied an incorrect legal standard. They further contend that in any event there was insufficient evidence to support the trial court's decision, and the court abused its discretion in not reserving a decision on the motion until after trial.

We affirm. We conclude the trial court applied the correct legal standard which required it balance the actual prejudice to David against the prosecution's justification for the delay. We further conclude there was substantial evidence that the nearly 24-year delay in filing this case caused David significant prejudice and there exists no reasonable justification for that delay. Moreover, the court did not abuse its discretion in dismissing the case rather than proceeding with trial.

## BACKGROUND

### 1. *Crimes and Investigation 1980 to 1981*

On Easter Sunday, April 6, 1980, Elsie and Robert left evening church services in La Jolla at approximately 9:30 p.m. to return to their Oceanside home. When Elsie did not appear at work the next morning, her coworkers asked neighbors William Borden and Gene Borden (together, the Bordens) to investigate. The Bordens knocked on Elsie and Robert's door but got no answer. They found all the doors and windows to the house locked except the window to the master bathroom at the rear of the residence. Gene Borden entered through that window and discovered Elsie's and Robert's dead bodies in the house. Gene Borden left the house through the master bathroom window and called the police.

Oceanside Police Sergeant Robert Krause entered the victims' home by way of the open master bathroom window. In a hallway off the master bedroom he found the body of Elsie, and about 20 feet farther down the hall he found the body of Robert. Elsie was shot in the head with a nine-millimeter semiautomatic handgun and was bludgeoned. Robert was shot twice in the head with a nine-millimeter handgun.

Officers determined the door locks in the house were double keyed, i.e., a key was required to unlock the door from both the inside and the outside. There were no signs of a forced entry. There were no signs the house was ransacked but the cords for all the telephones were pulled from the walls. Expended and unexpended nine-millimeter cartridges were found around the bodies but no nine-millimeter pistol was found.

David and his wife Linda Boysen (Linda) lived approximately 10 miles from his parents' house. On the morning of the discovery of the victims' bodies, the police contacted David and Linda and asked them to come to David's parents' house. After Linda identified the bodies, the two went to the Bordens' home across the street where the police questioned them. David told the police he and his wife were at their condominium the night of the murder. Linda agreed. David and Linda went through David's parents' house and told the police the only items missing were a nine-millimeter handgun kept in a paper bag on a closet shelf in the master bedroom and their will.

The police contacted neighbors, including Marge Naples. Naples told the officers she believed that on the night of the murders, while she was sitting in her kitchen, she heard one gunshot about 11:00 p.m. She later stated the time might have been 11:30 p.m. or 12:00 a.m. She then wrote the police a letter stating that after talking to her husband she believed she heard the shot at 11:15 p.m.

Gene Borden told the police she heard a small automobile engine about 11:30 p.m. the night of the murders.

Six fingerprints were taken from the master bathroom wall below the window, one print was taken from the master bedroom windowsill, and two prints were taken from the doorway of the master bedroom. In April 1980 a police fingerprint examiner compared the fingerprints taken at the crime scene with those of the victims and Sergeant Krause. He concluded that the prints found on the doorway of the master bedroom were those of Robert. He was unable to match any of the remaining prints.

In September 1981 the same examiner compared the prints taken at the crime scene to those of Elsie, Robert, David and Linda. He was unable to match any of the prints.

The police were aware of and investigated several possible suspects to the murder, including David Hobbs. David and Linda told the police that Hobbs was a possible suspect because he was involved in an altercation with Elaine Jarvis, an employee of Robert's Christian bookstore, and he was bitter. The police apparently concluded in 1980 that Hobbs was not involved in the killing but there is no indication why they so concluded.

In April 1980 the police received a tip from Melodie Rousseau that Richard Hagarman, a friend of her sister, had bragged about being involved in or knew who committed the murders of Elsie and Robert. Rousseau stated that Hagarman might have made the statement to appear important. A detective talked to Rousseau and her sister. They told the officers that Hagarman stated he had spoken with a man who claimed to have killed Elsie and Robert. The police tried to find Hagarman without success.

Friends of the victims believed they might have been killed by Mexican drug traffickers. Elsie and Robert were involved in Christian missionary work in Mexico and went there frequently in their truck to deliver supplies. It was speculated that drugs might have been placed in the truck by traffickers without the victims' knowledge. The truck was in for repair and was not at the victims' home the night of the murders, and some believed traffickers might have killed Elsie and Robert when they refused to tell them its location.

The drug traffickers theory was investigated by the police. Border crossing records showed several crossings by the victims' truck in 1979 but no crossings in 1980. There was evidence, however, that the victims were in Mexico in January 1980.

At the time of the investigation in 1980 and 1981, the police were aware that David was having serious financial problems.

By the end of 1981 David was the focus of the investigation into his parents' murders.

2. *Investigation 1982*

In 1982, after items linked to the victims were found in a Dumpster in Rancho Bernardo, the police contacted Linda, who was now separated from but still married to David. In August 1982 the police conducted a lengthy

interview of Linda. Contrary to her earlier statement that she and David were home together the night of the murders, she told officers she last saw David about 6:00 p.m. that evening. At that time David was wearing his favorite clothes, overalls, a particular T-shirt and brown tennis shoes. She did not see him again that evening until he arrived home at 10:30 p.m. When he arrived home, he was no longer wearing the clothes he had left in but was wearing a bathing suit. Linda never saw the overalls, T-shirt or shoes again. She additionally related a series of observations of and communications with David that tended to incriminate him in the murder of his parents.

Linda explained to the officers that about two weeks before the murders David learned that his parents had changed their will to leave their estate not to David and his sister but to their church. This made David very angry. The will was never found. At the time of the murders, Linda and David were experiencing serious financial problems.

Linda also told the officer that on March 2, 1980, she and David went to his parents' house while they were at church. David entered the house and told Linda to stay in the car. When David did not return, Linda went into the house. It appeared to her David was stealing money from a briefcase his parents carried to and from the bookstore. David was angry with her for coming in. To distract David and keep him from beating her, Linda suggested they make it look like the house had been burgled. They did so.

As had been the case from the beginning of the investigation, David refused to cooperate with the police.

### 3. *Rejection of Prosecution*

While there was circumstantial evidence suggesting David killed his parents, the police did not believe they had a solid case against him until their interview of Linda in 1982. The case was submitted to the district attorney. After thoroughly reviewing the matter, the district attorney's office declined to prosecute David. At the time of the hearing on the motion to dismiss in 2005, no copy of the form rejecting the police request for prosecution could be located. A police detective recalled that the basis for the rejection was that much of the evidence linking David to the murders consisted of privileged marital communications. There were other reasons for the rejection, but the detective could not recall what they were.

### 4. *2004 and the Cold Case Homicide Unit*

In 2003 the San Diego District Attorney's Office created a cold case homicide unit and solicited cases that police departments believed were

suitable for reinvestigation. In early 2004 the Oceanside Police Department suggested reinvestigation of the then 24-year-old murders of Elsie and Robert.

Linda, who divorced David in 1984, was reinterviewed and repeated and confirmed statements made in her 1982 interview incriminating David. However, she also reiterated that David was home at 10:30 p.m. David's sister and her husband were reinterviewed. They reconfirmed that the victims, not long before their deaths, rewrote their will to leave their estate to a religious organization and not to their children.

In 2004 a reexamination was done of the fingerprints found at the crime scene using the known prints employed by the examiner in 1980. At the time of the original investigation, six fingerprints were taken from the master bathroom wall below the window, one print was taken from the master bedroom windowsill, and two prints were taken from the doorway of the master bedroom. In 1980 an examiner concluded the fingerprints found on the doorway of the master bedroom were those of Robert. The examiner, however, could match none of the remaining prints to the victims, to David, or to Gene Borden and Sergeant Krause, both of whom had entered the house through the master bathroom window the night of the murders.

The reexamination in 2004, which relied on the same techniques used in 1980, but which employed multiexaminer review procedures not used then, concluded that three of the six prints found on the bathroom wall by the entry window were those of Sergeant Krause. Because of their poor quality, the remaining three prints on that wall could not be matched, but the examiner believed based on their location the prints were probably made by Sergeant Krause. The reexamination agreed with the 1980 conclusion that the prints found on the master bedroom doorway were those of Robert. The reexamination also concluded that the fingerprint found on the master bedroom windowsill was made by Sergeant Krause.

Using better quality prints from Sergeant Krause and David, the examiner was able to identify an additional print from the master bathroom wall below the window as that of the sergeant. While the examiner believed that based on their location the remaining two prints from the bathroom wall were those of Sergeant Krause, he could not state they were or were not his prints.

A reinvestigation was also conducted concerning persons identified in 1980 as possible suspects. Hobbs was identified as a possible suspect. Both in 1980 and in 2004 the police were aware of two persons with the name David Hobbs. In August 2004 Rick Johnsen, who lived in Missouri, called the district attorney's office and stated that a friend, Bob Fischer who lived in

Carlsbad, told him that Bill Warren said he sold a nine-millimeter gun to a person named David Hobbs two weeks before the murders. When interviewed, Johnsen said Warren was concerned because he had sold Hobbs a nine-millimeter gun, knew Hobbs had a tendency to violence and knew he disliked Elsie and Robert. Johnsen learned about the case being reopened from a newspaper article.

Johnsen also stated that in 1990 he spoke with Fischer. Fischer told Johnsen that about two weeks before the murders, Hobbs said that he hated Elsie and Robert and was going to kill them. Fischer said he did not tell the police because he was afraid.

Fischer was interviewed. Fischer stated he knew Elsie and Robert. After the murders, he speculated that the Mexican Mafia killed them because they were so effective in converting persons to Christianity and this disrupted the recruitment of boys into the gang. Fischer also believed it was possible Elsie and Robert had offended Hobbs and he had murdered them. Fischer, however, never heard Hobbs make any threats to kill Elsie and Robert or heard anyone say they had heard Hobbs make such threats. Fischer stated he did not recall anyone named Warren and did not recall telling anyone that someone sold Hobbs a gun.

Warren was interviewed. He stated he did not sell Hobbs a gun and had no contact with Hobbs after the mid-1970's.

Hobbs's brother Richard was interviewed and stated Hobbs owned a nine-millimeter handgun but he did not know when he acquired it. All of Hobbs's guns, including the nine-millimeter, were destroyed in a fire in 1990. Richard knew of no reason why Hobbs would be angry with Elsie and Robert. Hobbs died in 1998.

Jarvis reported that she worked at Elsie and Robert's bookstore and attended their church in the late 1970's. During that time, Hobbs became obsessed with her, harassing her and breaking into her house. Jarvis contacted an attorney to get a restraining order against Hobbs but never obtained it. Jarvis assisted another person in getting a restraining order against Hobbs. Hobbs knew Robert and regularly attended Elsie and Robert's church. Jarvis was unaware of any threats made by Hobbs against Elsie and Robert. She believed Hobbs was dangerous.

In 2005 Hagarman, another possible suspect identified in 1980, was located in a Texas jail. When interviewed, he stated he knew nothing about the murders and had never said anything about them.

Naples, the victims' neighbor who reported hearing a gunshot at 11:15 p.m. the night of the murders, a time when Linda stated David was at home, died in 2001.

Gene Borden, the neighbor who reported hearing a small automobile engine about 11:30 p.m. on the night of the murders and to whose home David and Linda went immediately after leaving the crime scene, died in 1994.

### 5. *Prosecution and Motion to Dismiss*

In October 2004, following a complaint filed in May 2004, the San Diego District Attorney filed an information charging David with two counts of murder with special circumstances.

On April 15, 2005, David moved for dismissal of the prosecution based on prejudicial, unjustified preaccusation delay.

After a lengthy hearing, the trial court found David was prejudiced by the delay between the crimes and the commencement of prosecution. After balancing that prejudice against the justification for the delay offered by the prosecution, the trial court found the delay denied David's right of due process and dismissed the case.

### DISCUSSION

In a series of arguments, the People contend the trial court erred in dismissing its prosecution of David. They argue that in finding a denial of due process, the court erred by balancing the prejudice resulting from preaccusation delay against the prosecution's claimed justification for that delay. They argue that a dismissal for prejudicial preaccusation delay is only proper when the delay was undertaken by the prosecution to gain a tactical advantage. They contend there is no evidence of such intent here. In the alternative, they argue that even if the court properly used the balancing test, it erred in finding a denial of due process. Finally, they argue the trial court abused its discretion when it refused to delay its ruling on preaccusation delay until the end of trial.

### A. *Due Process and Preaccusation Delay*

The trial court properly applied a balancing test in deciding if David was denied due process because of preaccusation delay. It correctly required David to first show actual prejudice and when he did so, the court examined the justification for delay offered by the district attorney.

■ In *People v. Catlin* (2001) 26 Cal.4th 81 [109 Cal.Rptr.2d 31, 26 P.3d 357] our Supreme Court outlined the general law applicable to claims that preaccusation delay resulted in a denial of due process. "Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay [the balancing test]. (*Scherling v. Superior Court* (1978) 22 Cal.3d 493, 504–507 [149 Cal.Rptr. 597, 585 P.2d 219]; see also *People v. Morris* (1988) 46 Cal.3d 1, 37 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543–544, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527]; *People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 910–912 [55 Cal.Rptr.2d 404].) A claim based upon the federal Constitution also requires a showing that the delay was undertaken to gain a tactical advantage over the defendant [the tactical advantage test]. (See *United States v. Lovasco* (1977) 431 U.S. 783, 795 [52 L.Ed.2d 752, 97 S.Ct. 2044]; see also *People v. Frazer* (1999) 21 Cal.4th 737, 774 [88 Cal.Rptr.2d 312, 982 P.2d 180].)" (*Id.* at p. 107.)

For a variety of reasons, the district attorney argues this statement by our Supreme Court misstates the law and that the trial court erred in not applying the tactical advantage test. She asserts that under *both* the federal and state Constitutions there is no denial of due process unless the delay was deliberately undertaken by the prosecution to gain tactical advantage over a defendant. She makes two arguments. First, she notes that in *People v. Archerd* (1970) 3 Cal.3d 615, 640 [91 Cal.Rptr. 397, 477 P.2d 421], our Supreme Court stated that to amount to a denial of due process, delay "must be purposeful, oppressive, and even 'smack of deliberate obstruction on the part of the government.' " The district attorney argues that later California Supreme Court authority, stating that deliberate delay is not required for a finding of a denial of due process, is mere dicta and we are bound to follow *Archerd*. Second, the district attorney argues that whatever the position of the California Supreme Court, the Right to Truth-in-Evidence provisions of Proposition 8 (Cal. Const., art. I, § 28, subd. (d) (section 28(d)) forecloses dismissal of a prosecution for preaccusation delay unless the delay is undertaken for tactical advantage.

Neither of the district attorney's arguments has merit.

1. *State Case Law*

■ It is firmly established California law that a finding of a denial of due process based on preaccusation delay is not dependent on a finding that the

delay was undertaken by the prosecution to disadvantage the defendant. It is true that in *Archerd* our Supreme Court stated that preaccusation delay must be purposeful and "even 'smack of deliberate obstruction . . . .'" (*People v. Archerd, supra,* 3 Cal.3d at p. 640.) Soon after, however, the Court of Appeal in *Penney v. Superior Court* (1972) 28 Cal.App.3d 941, 951–952 [105 Cal.Rptr. 162], citing *Jones v. Superior Court* (1970) 3 Cal.3d 734, 741, footnote 1 [91 Cal.Rptr. 578, 478 P.2d 10], held that negligent delay can violate due process. In *People v. Hannon* (1977) 19 Cal.3d 588, 610–611, footnote 12 [138 Cal.Rptr. 885, 564 P.2d 1203], the court, citing *Penney,* noted the tension between *Archerd, Jones* and *Penney* but found no need to resolve it.

In *Scherling v. Superior Court, supra,* 22 Cal.3d at page 507, a unanimous court, citing *Penney,* addressed the issue. The court stated: "We do not intend to imply that only a deliberate delay by the prosecution for the purpose of prejudicing the defense may justify a conclusion that a defendant has been deprived of due process. The ultimate inquiry in determining a claim based upon due process is whether the defendant will be denied a fair trial. If such deprivation results from unjustified delay by the prosecution coupled with prejudice, it makes no difference whether the delay was deliberately designed to disadvantage the defendant, or whether it was caused by negligence of law enforcement agencies or the prosecution. In both situations, the defendant will be denied his right to a fair trial as a result of government conduct."[1]

While an argument can be made to the contrary, it has been stated (see *People v. Pellegrino* (1978) 86 Cal.App.3d 776, 780 [150 Cal.Rptr. 486]), and the People assert, that this language in *Scherling* is dicta. What is significant, however, for our purposes is that in *People v. Catlin, supra,* 26 Cal.4th at page 107, the court differentiated federal and state law on preaccusation delay by noting that under federal due process law, but not California law, a showing was required that delay was undertaken to gain a tactical advantage over the defendant.

Since *Scherling,* the Courts of Appeal have uniformly applied a balancing test, and have concluded a determination of deliberate delay is not required under California law for a finding that a preaccusation delay resulted in a denial of due process. (See *People v. Dunn-Gonzalez, supra,* 47 Cal.App.4th at p. 911;

---

[1] In considering whether a test of due process or statutory speedy trial rights controls preaccusation delay, *People v. Scherling* reaffirms *Archerd*'s application of the due process test, and, citing *Jones v. Superior Court, supra,* 3 Cal.3d at page 741, footnote 1, and *People v. Bradford* (1976) 17 Cal.3d 8, 18–19 [130 Cal.Rptr. 129, 549 P.2d 1225], states: "But regardless . . . , the test is the same, i.e., any prejudice to the defendant resulting from the delay must be weighed against justification for the delay." (*Scherling v. Superior Court, supra,* 22 Cal.3d at p. 505, fn. omitted.)

*People v. Hartman* (1985) 170 Cal.App.3d 572, 581 [216 Cal.Rptr. 641]; *People v. Pellegrino, supra,* 86 Cal.App.3d at p. 780.)

■ Not only do we conclude that the balancing test is the law in California, we also conclude that when combined with a high regard for prosecutorial discretion and judgment, it is the better test. The decision when to proceed with a prosecution is exclusively one for the executive branch of government. It can be a complex question and prosecutors have great discretion in deciding when and if to proceed. Simple wisdom and a due regard for the separation of powers doctrine allow for no other rule. Nonetheless, due process is ultimately tied to the fundamental conceptions of justice that lie at the base of our civil and political institutions and which define the community's sense of fair play and decency. (*People v. Dunn-Gonzalez, supra,* 47 Cal.App.4th at p. 914.) Our sense of fair play is properly offended when, with little or no justification, the government waits decades to bring a prosecution and that delay has demonstrably placed the defense at a profound and perhaps fatal disadvantage. It is inconceivable that even the total loss of a defendant's ability to defend is constitutionally irrelevant unless it can be shown that the delay was undertaken to gain tactical advantage. This is especially true in cases, like the present one, in which the reasons for the prosecution's delay cannot be fully reconstructed by either party.

### 2. · *Article I, Section 28(d)*

The district attorney argues in the alternative that this body of state law is meaningless. She argues that the Right to Truth-in-Evidence provisions of article I, section 28(d) of the California Constitution does not allow dismissal of a prosecution based on preaccusation delay unless that delay was deliberate and designed to create an advantage over the defendant.

■ In relevant part article I, section 28(d) of the California Constitution states, with exceptions not here applicable, "relevant evidence shall not be excluded in any criminal proceeding." The district attorney argues that the dismissal of a prosecution, apparently for whatever reason, is the ultimate exclusion of evidence and, thus, is controlled by section 28(d). The application of that provision to the issue of preaccusation delay would mean that dismissal of a criminal prosecution for such delay could only be ordered if the delay was violative of the federal Constitution, i.e., if the delay was prejudicial and was undertaken to disadvantage the defendant.

The first answer to the district attorney's argument is that California Constitution, article I, section 28 is applicable only to crimes committed after its effective date of June 9, 1982. (*People v. Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].) The crimes here were committed in 1980,

and whatever section 28(d)'s effect on due process under the California Constitution, it does not affect this case.[2]

Even if California Constitution, article I, section 28(d) required we apply federal constitutional law in this context, there is no controlling federal law on the subject. Two United States Supreme Court cases, *United States v. Marion* (1971) 404 U.S. 307 [30 L.Ed.2d 468, 92 S.Ct. 455] and *United States v. Lovasco, supra,* 431 U.S. 783 [52 L.Ed.2d 752, 97 S.Ct. 2044], have considered the question of preaccusation delay, and while both cases note the prosecutorial concession that deliberate delay to disadvantage a defendant would constitute a denial of due process, neither holds that a showing of deliberate delay is required before a prosecution may be dismissed. (*United States v. Marion, supra,* 404 U.S. at pp. 324–325; *United States v. Lovasco, supra,* 431 U.S. at pp. 795–797; see *United States v. Gross* (2001) 165 F.Supp.2d 372, 378–380.) It is one thing to conclude, as those cases do, that delay for tactical advantage constitutes a violation of due process, it is another to conclude delay for tactical advantage must be shown before a due process violation may be found to exist. We observe in this regard that *Marion* and *Lovasco* are entirely consistent with California's balancing test. Once the defendant demonstrates actual prejudice, the prosecution is called upon to present its justification for the delay. If the delay was to gain a tactical advantage then, as *Marion* and *Lovasco* instruct, there can be no justification and the balance necessarily tips to a conclusion there was a denial of due process.

We observe as well that federal appellate cases are not uniform in their interpretation of *Marion* and *Lovasco*. In 1988 Justice White, in a dissent to a denial of certiorari, noted a split in the federal circuits on the correct test for determining if preaccusation delay amounts to a violation of due process. (*Hoo v. United States* (1988) 484 U.S. 1035, 1035–1036 [98 L.Ed.2d 777, 108 S.Ct. 742].) That split still exists. While the majority of federal circuits

---

[2] The People urge we should nonetheless apply California Constitution, article I, section 28(d). Even if we were to apply the section to pre-Proposition 8 crimes, we are not as confident that the section encompasses a complete dismissal of a case based on violation of due process. The literal language of California Constitution, article, I, section 28 assumes its application to *evidence* introduced at a criminal proceeding. Evidence Code section 140 defines "evidence" as "testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." Nothing in this definition suggests "evidence" includes "dismissals." Nothing in section 28(d) suggests Proposition 8 was intended to require that federal dismissal rules apply in California.

Moreover, we note the section was enacted by Proposition 8, an initiative. Initiatives may amend but not revise the Constitution. (Cal. Const., art. XVIII.) If California Constitution, article, I, section 28(d) is as broad as the district attorney suggests, then an argument can be made that, given its breadth and its effect on the judicial interpretation of our state Constitution, it is a revision and unconstitutional. (See generally *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 349–355 [276 Cal.Rptr. 326, 801 P.2d 1077].)

employ the tactical advantage test, three circuits apply the balancing test. (*U.S. v. Barken* (9th Cir. 2005) 412 F.3d 1131; *U.S. v. Henderson* (7th Cir. 2003) 337 F.3d 914, 920; *Jones v. Angelone* (4th Cir. 1996) 94 F.3d 900, 905.)[3]

A similar split exists in state courts. While a majority applies the tactical advantage test, many apply the balancing test. (See, e.g., *State v. Knickerbocker* (2005) 152 N.H. 467 [880 A.2d 419, 421–424]; *State v. Salavea* (2004) 151 Wn.2d 133 [86 P.3d 125, 127]; *State v. Wright* (2000) 2000 MT 322 [302 Mont. 527, 17 P.3d 982, 986–987]; *Scott v. State* (Fla. 1991) 581 So.2d 887, 891–892; *State v. English* (1979) 61 Haw. 12 [594 P.2d 1069, 1073, fn. 8].)[4]

Even if, therefore, article I, section 28(d), applies to the dismissal of prosecutions for preaccusation delay, there is no controlling federal authority limiting such dismissal to situations in which the delay was deliberate and designed to disadvantage defendants; and there is no requirement, therefore, that we limit dismissal to those cases in which delay was undertaken to disadvantage the defendant. Since there is no controlling federal law on the subject, the courts of this state are free to independently interpret the United States Constitution. (See *In re Tyrell J.* (1994) 8 Cal.4th 68, 79 [32 Cal.Rptr.2d 33, 876 P.2d 519].) Our state Supreme Court and our Courts of Appeal have done so, and have chosen to apply the balancing test.

---

[3] In his treatise, Prosecutorial Misconduct, Professor Gershman says this, "Most courts have bypassed the Supreme Court's invitation [in *Marion* and *Lavasco*] to assess the propriety of reasons for the delay. Instead, they have taken the Court's example of a tactical delay as a prerequisite for finding a due process violation and have routinely rejected due process claims when there is no showing of an intentional prosecutorial delay to gain a tactical advantage. Arguably, a tactical delay could be taken as the minimum standard for a due process violation, as representing a flagrant example of prosecutorial misconduct. Although a delay caused by an intent to harass a defendant or gain a tactical advantage over him would violate due process, the Supreme Court did not rule out the possibility that other unconstitutional reasons might also exist." (Gershman, Prosecutorial Misconduct (2d ed.) 8:10, fns. omitted.)

[4] New York applies its own unique test that does not require prejudice to the accused. In *People v. Lesiuk* (1993) 81 N.Y.2d 485, 489 [600 N.Y.S.2d 931, 617 N.E.2d 1047, 1050], the court stated: "We have consistently held that ' "unreasonable delay in prosecuting a defendant constitutes a denial of due process of law" ' (*People v. Singer*, 44 N.Y.2d 241, 253 [405 N.Y.S.2d 17, 376 N.E.2d 179]; *People v. Staley*, 41 N.Y.2d 789, 791 [396 N.Y.S.2d 339, 364 N.E.2d 1111]; *see also*, N.Y. Const., art. I, § 6). An unjustifiable delay in commencing the prosecution may require dismissal even though no actual prejudice to the defendant is shown (*People v. Singer*, 44 N.Y.2d, at 253–254, . . . *supra*). Where there has been a prolonged delay, we impose a burden on the prosecution to establish good cause (*see, People v Singer*, 44 N.Y.2d, at 254, . . . *supra*). We recognize that there is a need to investigate to discover the offender, to eliminate unfounded charges, and to gather sufficient evidence prior to the commencement of a prosecution (*see, id.*). Thus, we stated that 'a determination made in good faith to defer commencement of the prosecution for further investigation or for other sufficient reasons, will not deprive the defendant of due process of law even though the delay may cause some prejudice to the defense' (*id.*, at 254 [405 N.Y.S.2d 17, 376 N.E.2d 179])."

### B. Substantial Evidence

The district attorney argues that even assuming the trial court applied the correct test, the evidence was insufficient to support its dismissal of the case.

#### 1. Law

■ Under the balancing test, when a defendant demonstrates prejudice, the prosecution must offer justification for the delay. Once the prosecution does so, the trial court balances the harm done the defendant against the justification. (*People v. Catlin, supra*, 26 Cal.4th at p. 107.) In a broad sense the trial court's task "is to determine whether precharging delay violates the fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." (*People v. Dunn-Gonzalez, supra*, 47 Cal.App.4th at p. 914, citing *United States v. Lovasco, supra*, 431 U.S. at pp. 790–796.)

In balancing prejudice and justification, it is important to remember that prosecutors are under no obligation to file charges as soon as probable cause exists but before they are satisfied that guilt can be proved beyond a reasonable doubt or before the resources are reasonably available to mount an effective prosecution. Any other rule "would subordinate the goal of orderly expedition to that of mere speed." (*People v. Dunn-Gonzalez, supra*, 47 Cal.App.4th at p. 915.)

The balancing task is a delicate one, "a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. [Likewise], the more reasonable the delay, the more prejudice the defense would have to show to require dismissal." (*People v. Dunn-Gonzalez, supra*, 47 Cal.App.4th at p. 915.)

The question of whether preaccusation delay is unreasonable and prejudicial is a question of fact. If the trial court concludes the delay denied the defendant due process, the remedy is dismissal of the charge. Our role is limited. The trial court's ruling is upheld on appeal if supported by substantial evidence. (*People v. Mitchell* (1972) 8 Cal.3d 164, 167 [104 Cal.Rptr. 348, 501 P.2d 916].)

#### 2. Discussion

We conclude there is substantial evidence supporting the trial court's dismissal based on preaccusation delay of David's prosecution.

█ It is certainly the case that there is no statute of limitations on murder. (Pen. Code, § 799.) This alone, however, has no effect on the issue of a denial of due process arising from prejudicial delay in bringing accusations. The murders in this case occurred almost a quarter of a century before David was charged with them. The passage of time fades memories, sees the death of important witnesses and often results in the loss of physical evidence. All of those occurred here.

We review the issues of prejudice and justification.

### a. *Prejudice*

The trial court concluded David presented "extensive evidence" of prejudice caused by preaccusation delay. The court opined it would be difficult to find a case that would not be prejudiced by such a lengthy delay. It concluded the most important evidence lost was that dealing with a possible defense of alibi. We agree.

Linda's statements to the police about David's comments and behavior around the time of the murders were highly incriminating. One fact she related, however, and from which she never retreated in any interview, was potentially exonerating. Linda stated that on the night of the murders David returned home at 10:30 p.m. Naples, the victims' neighbor, told the police that on the night of the murders, while she was sitting in her kitchen, she heard a gunshot sometime between 11:15 p.m. and 12:00 a.m.

Naples would seemingly have been an excellent witness for the defense. She was the former tax collector for the City of Long Beach, a pilot, wrote books on cats and was a respected cat show judge. Naples, however, died in 2001. Not only did her death deny the defense her statement about hearing a shot the night of the murders, it denied the defense the ability to develop additional evidence concerning what she heard and the particular circumstances under which she heard it. The police investigation of Naples was not extensive.

The People suggest there is no serious problem with Naples's testimony since they would be willing to forgo a hearsay objection to any statements made by her in 1980. As the trial court pointed out, however, the prosecution's offer to allow Naples's cold statement to be admitted did not foreclose the prosecution from attempting to impeach her. Because Naples was dead, it would be impossible for the defense to develop additional supporting evidence from her and to rehabilitate their witness. While an offer to allow a hearsay statement from a witness might be a meaningful concession when the evidence is merely supportive or foundational or when not a matter of serious contention, it is not meaningful when the evidence is crucial to the case and highly contested.

The trial court also noted that Gene Borden, the neighbor who entered Elsie and Robert's house and found the bodies, told police she heard the engine of a small car at 11:30 p.m. the night of the murders. While that fact was not as useful to the defense as Naples's statement concerning hearing a shot, it was nonetheless useful. Gene Borden died in 1994. Not only did her death mean that the defense could not interview her concerning the engine sound, it also meant the defense could not question her concerning her observations as the first person at the murder scene. In any event, were she still alive it is questionable how useful a defense interview of her would be separated from the events by over two decades.

The trial court also noted that in other respects the passage of time affected David's ability to offer an alibi defense. On the night of their deaths, Elsie and Robert attended Easter evening church services in La Jolla, a considerable distance from their home in Oceanside. There was some evidence that while the service ended at 8:30 p.m., they did not leave for home until 9:30 p.m. Because Linda stated David was home at 10:30 p.m., establishing a timeline for the victims the evening of their deaths and determining driving times from the church to their home and from their home to David's condominium was of great importance. Both the prosecution and the defense in 2004 determined driving distances and times. While those determinations are undoubtedly useful to understanding events in 1980, they cannot be as accurate as time and distance estimates that could have been made in 1980. Of greater importance is that it is now impossible to create a more accurate estimate for when Elsie and Robert left La Jolla and to determine whether they stopped on their way home.

The trial court also concluded preaccusation delay was prejudicial with regard to third party culpability evidence. In 1980 and 1981 there was evidence that persons other than David might have murdered the victims or had an interest in their deaths. While some suggestions of third party culpability in 1980 and 1981 were mere speculation, e.g., the possibility they were killed by drug traffickers, other evidence was more credible and might have been meaningfully investigated by the defense.

As the trial court noted, the most important third party culpability evidence concerned Hobbs. There was evidence that he knew and disliked the victims perhaps because of their connection with a woman who worked at their bookstore, and with whom Hobbs had a difficult relationship. Hobbs at least

at some time owned a nine-millimeter handgun and had a history of violence. Hobbs died in 1994. The inability because of the passage of time to explore Hobbs's possible involvement in the murder of Elsie and Robert was prejudicial to the defense.

The trial court also concluded that the failure of the police in 1980 to fully investigate the murders, document the crime scene, conduct forensic tests and retain important physical evidence, e.g., an open briefcase found at the scene, all made investigation of the crime and the development of a defense in 2004 very difficult.

## b. *Justification for Delay*

The trial court noted that while all three copies of the 1982 form rejecting prosecution of David are now missing, it appears at least a major basis for that rejection was the effect of the marital communication privilege on Linda's crucial testimony. David, as holder of the martial communications privilege, could have foreclosed Linda testifying in 1982 and 2004 concerning confidential communications made by him to her during their marriage. (Evid. Code, § 980.) It is true that part of the incriminating nature of Linda's testimony was based on admissible observations made by her before and after the murders. (*People v. Cleveland* (2004) 32 Cal.4th 704, 743 [11 Cal.Rptr.3d 236, 86 P.3d 302].) However, the observations were known to the prosecution in 1982 and did not change between 1982 and 2004.

The district attorney argues that what changed in the 22 years since its decision not to prosecute was new fingerprint and forensic evidence. Most of that evidence, however, provided no justification for the delay in David's prosecution. While the People did generate new forensic evidence concerning the bullets and cartridges found at the scene and from blood splatter analysis, that evidence merely illuminated how the murders occurred and did not point to David as the killer.

The only real change from 1982 that tended to assist in preparing the prosecution's case was the reexamination of fingerprints found at the scene. In 1982 the fingerprint examination was almost totally inconclusive and left open the possibility, also useful to the defense, that someone other than Gene Borden and Sergeant Krause entered Elsie and Robert's home through the master bathroom window and left their fingerprints at the scene. When the fingerprints were reexamined in 2004, using the same techniques used in

1980 but with more extensive review and with better known prints from Sergeant Krause, most but not all the latent prints could be matched with those of the sergeant. Additionally, the examiner was willing to opine that given the position of the unmatched prints they also were those of the sergeant. This is useful but does not in the least foreclose the possibility that someone else, perhaps gloved, also came through the master bathroom window that night.

### 3. *Conclusion*

██ There is no doubt David was prejudiced by the 24-year delay between the murders and the commencement of the prosecution. The district attorney's claims of justification for that delay are unconvincing. In 1982 the district attorney's office, faced with a case they might or might not have been able to prove, made a decision not to prosecute David. That decision was within the prosecution's prerogative. We attribute no bad faith to the district attorney; however, it is clear what has changed in the past 24 years is not the evidence but the willingness to proceed.

There is substantial evidence supporting the trial court's decision to dismiss the prosecution against David based on preaccusation delay.

### C. *Timing of Ruling*

The district attorney argues the trial court abused its discretion when it refused to delay its ruling on preaccusation delay until after trial.

██ It is within the discretion of the trial court to rule on a motion to dismiss based on preaccusation delay before, during or after trial. (*People v. Pinedo* (2005) 128 Cal.App.4th 968, 975 [27 Cal.Rptr.3d 562]; *People v. Abraham* (1986) 185 Cal.App.3d 1221, 1225–1226 [230 Cal.Rptr. 325].) As to granting a dismissal before trial, the court in *Pinedo* stated: "[W]here the loss of evidence is easily quantified and there is no need for a further delay, the defendant should be able to obtain a dismissal at the earliest possible time to avoid any further oppression and harassment beyond that he has already suffered by an unjustifiable delay." (*People v. Pinedo, supra*, 128 Cal.App.4th at p. 975.)

The delay in this case was lengthy. The prejudice to David arose from the death of important witnesses, the irreparable fading of memory and the complete inability to pursue important lines of investigation. The trial court could reasonably conclude that nothing would be gained by delaying its ruling on the motion to dismiss until the end of a lengthy and expensive trial. The trial court acted properly in dismissing the prosecution of David before trial.

The order dismissing the case is affirmed.

McConnell, P. J., and Haller, J., concurred.