Filed 7/29/13  P. v. Hoover CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>BRADLEY DEON HOOVER,<br><br>Defendant and Appellant. | C069060<br><br>(Super. Ct. No. 11F02341) |

In 1994, defendant Bradley Deon Hoover kidnapped and murdered his victim. He was first charged with these crimes in 1994, and was incarcerated on an unrelated charge that same year, but his kidnapping and murder case did not proceed to jury trial until the year 2011--a 17-year delay.  Before his trial commenced, he moved to dismiss his case for dilatory prosecution.  The trial court denied his motion.

The jury found him guilty of first degree murder while engaged in the commission of the crime of kidnapping (count 1; Pen. Code,[1] §§ 187, subd. (a); 190.2, subd. (a)(17)(B)) and kidnapping (count 2; § 207, subd. (a)), and the trial court sentenced him

---

[1] Further undesignated statutory references are to the Penal Code.

to life in prison without possibility of parole.  Defendant appeals, contending that the trial court erred by denying his pretrial motion to dismiss and the delay in his prosecution deprived him of due process.  He adds that the jail classification and booking fees imposed at sentencing should be stricken because there was no showing he had the ability to pay.  Disagreeing, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Defendant's Charging and Prosecution*

*1994-1995*

The kidnapping and murder were alleged to have occurred in Sacramento County on August 8, 1994, but defendant was not immediately charged.  He was under investigation for an unrelated crime in Solano County as of March 1994 and was arrested in that case on October 20, 1994.

On November 1, 1994, the People filed a felony complaint against defendant and Andrea Marie Carvalho,[2] accusing both of the murder and kidnapping of victim Michael Agustin.  Carvalho's preliminary hearing, held in December 1994, ended in dismissal, with the magistrate finding insufficient evidence on all counts.[3]  Defendant was not arraigned on the complaint as his Solano County case was ongoing; he was subsequently prosecuted, convicted, and sentenced to prison in the Solano County case.

---

[2]  Carvalho later married defendant.

[3]  As we discuss *post*, a transcript of Corvalho's preliminary hearing was not available at defendant's trial.

On December 5, 1995, the Sacramento County Sheriff's Department filed a detainer against defendant, notifying him of the present case and his right to request its disposition under section 1381.[4]

*2011*

On January 7, 2011, defendant filed a demand for trial in the present case. On January 28, 2011, the District Attorney's investigator interviewed defendant in prison. Defendant told the investigator this case had had "no bearing on [him] whatsoever for the last 16 years[,]" but he had filed his request for trial now because he wanted to get a job in prison and the hold on him from this case prevented it.

On February 7, 2011, the court arraigned defendant on the original complaint; three days later, the People filed an amended complaint, naming only defendant. He entered a plea of not guilty. On March 1, 2011, the trial court held defendant to answer on the amended complaint, then deemed it an information.

The People thereafter dismissed the original case and rearrested defendant on March 29, 2011. Defendant waived preliminary hearing. On April 22, 2011, the People filed a new information, case No. 11F02341.

*Defendant's Motion to Dismiss*

On June 16, 2011, defendant filed a "motion to dismiss or for other sanctions due to dilatory prosecution." He argued that the People violated his speedy trial rights under the California Constitution because the 17-year delay in bringing the case to trial had prejudiced him by hindering his ability to prepare his defense. As evidence, he cited (1) his inability to recall the facts surrounding the alleged crimes; (2) the alleged destruction of the preliminary hearing transcript in Carvalho's case; (3) the disappearance of witness

---

[4] Section 1381 provides in pertinent part that a defendant serving a prison sentence, if charged in any other pending criminal proceeding, must be brought to trial within 90 days after the defendant requests trial in writing.

John Wagner, who was never interviewed by defense counsel; (4) the lack of any further investigation of the case since defendant's arrest in 1994 on the Solano County case; and (5) the unavailability of witness Terry Walling.

*Opposition*

The People opposed the motion, arguing that because, aside from Wagner and Walling (whose unavailability *benefitted* defendant), all material witnesses had been located and subpoenaed, and all material physical evidence had been preserved, defendant had not shown actual prejudice under the California Constitution.[5]

*Defendant's Response*

Defendant cited the following as further evidence of prejudice: (1) Wagner's mother informed the police in November 2009 that around the time Wagner disappeared, a cousin named Sam Kissell had threatened to kill him over a drug debt; the police had done nothing to follow up on this information, which might bear on Wagner's credibility.[6] (2) The police and the District Attorney's investigator had only just interviewed Dale Allbright, whose motorcycle broke down near the Rio Vista Bridge around 2:00 a.m. on August 9, 1994, and who was picked up by an unidentified male in the only car Allbright had seen on the road that evening. Timely investigation of his story might have revealed that the unidentified male murdered the victim, or led to the

---

[5] On appeal, defendant agrees that his Sixth Amendment (federal) speedy trial right is not at issue as it was not triggered until the filing of the information in case No. 11F02341. (See, e.g., *People v. Martinez* (2000) 22 Cal.4th 750, 756 (*Martinez*).)

[6] Wagner's mother testified that she had actually told the police about this near the time of Wagner's disappearance.

discovery that someone else other than defendant did so.[7]  (3) All police dispatch records from the night of the crime had been destroyed or purged due to the passage of time.

*The Trial Court's Pretrial Ruling*

The trial court ruled tentatively in limine that defendant had shown "some evidence of actual prejudice" from the delay in prosecution, based on the lack of a transcript of Carvalho's preliminary hearing and the destruction of the police dispatch logs.[8] The court did not mention any other item cited in defendant's briefing.  It indicated it did not find defendant's claim of faded memory persuasive as to prejudice, but that it might instruct the jury on faded memories and missing witnesses if the evidence proved to warrant such instruction.

Having found prejudice from the delay in prosecution, the trial court asked the prosecutor to justify the delay.  The court said it thought the People might have been hoping witness Wagner would "resurface."  The prosecutor agreed:  "That is the reason."

---

[7] Allbright testified at trial.  He could not say precisely where his motorcycle broke down or where the unknown driver (whom he described only as "a white guy") picked him up.  He did not see police cars or helicopters that night.

[8] Defense counsel declared that, according to the Sacramento Court Reporter's Office, the transcript had been destroyed.  The prosecutor, who had also represented the People at the preliminary hearing in 1994, declared that at the hearing Carvalho's defense attorney had argued Carvalho was merely present at the crime scene.  He added that it was the policy of the Sacramento County Superior Court (in 1994 and continuing) *not* to prepare transcripts of preliminary hearings in cases where defendants were not held to answer unless a party so requested.

Defense counsel asserted that Carvalho had told him that at her preliminary hearing the story told by defendant's accusers, as presented by the investigating officer pursuant to Proposition 115, was impeached.  The prosecutor replied that, as stated in his declaration, the magistrate had not held Carvalho to answer due to the absence of proof that she had any control over the situation leading to the murder, rather than because the accusation against defendant was credibly challenged.

The trial court denied defendant's motion to dismiss, but left open the option to revisit the issue of "faded memories" if warranted based on the evidence presented at trial.

*Trial Evidence*

On August 8, 1994, at 10:48 p.m., officers dispatched to a rural location near Rio Vista for a reported pedestrian-vehicle accident found victim Agustin, fatally shot in the head. Agustin had been shot first at one location, then again at another location about 200 yards away, by a single firearm.[9]

On the morning of August 8, 1994, Agustin visited his sister, Cynthia Hylton, at her home in Vallejo. She knew he was "involved in the drug scene" and hung out at Terry Walling's house. He did not have a job or a regular place to live. He had become increasingly fearful and paranoid in the last few months. He arrived on a new motorcycle (which he did not have the money to buy, as far as she knew) and put it in her garage; he also had a gun. He telephoned someone on her home phone, yelling, "Hey, I told you not to tell" or "Why did you tell him?" He borrowed her car for a short time, returned it, and left again.

Alfredo Ramirez, Agustin's nephew, saw Agustin on the afternoon of August 8, 1994.[10] Ramirez had recently observed changes in Agustin's behavior that he perceived to be related to methamphetamine use. Agustin called Ramirez from Hylton's home, asking for a ride in his car. Ramirez took him to get money from someone, then drove him to Walling's house and dropped him off around 3:00 or 4:00 p.m. He did not see Agustin alive after that.

---

[9] The officers did not disclose to the media or the victim's family how many times Agustin was shot or at how many locations.

[10] The two men were six years apart in age and were like brothers.

Terri Hussey, defendant's friend, was at Walling's house, described as a "gathering place for people," when Agustin arrived. She had seen him there before, but did not know him well.

Later, defendant came to the house. After that, John Wagner (a drug user who was down on his luck and living on the streets) arrived, but tried to leave when he saw defendant. Defendant said he needed to talk to Wagner and told him to sit down.

Defendant said something had happened that he needed to talk about with Agustin. A "meeting" ensued, involving defendant, Wagner, and Agustin, among others. Defendant was the dominant person in the conversation.

"[T]earing up," Agustin said to Walling: "[P]lease don't let him take me. I don't want to go. Help me." Defendant, Wagner, and Agustin walked out of the house; defendant told Agustin not to make a scene and to "act like it was a casual walk across the street." Several people were outside, including Carvalho.

As defendant was leaving, Hussey said to him: "I don't know what's going on here, but is it as bad as what Don had did [*sic*][?]"[11] Defendant said it was worse. Hussey said she did not want to know any more and went inside. After Wagner came to the house and as he was leaving, Hussey saw a red convertible Chrysler LeBaron parked outside. Wagner had borrowed a red convertible Chrysler LeBaron from his friend in August 1994 and failed to return it. It was later recovered, inoperable, in Rio Vista.

The next day, police officers came to the house. Hussey and the others there denied any knowledge of what had happened to Agustin. Subsequently, Hussey had a conversation with Patti Brown, at whose home she was staying. According to Hussey, Brown said Carvalho, seeming "scared" and "frantic," had told Brown that she and defendant: "took [Agustin] to Yolo County out in the slough, something like that. They

---

[11] Don Riley testified that defendant had beaten and humiliated him because he received a tattoo from someone defendant disliked.

7

shot him. He was shot once in the head or something, and then they drove off and then had a funny feeling and turned around and came back and he had drug [*sic*] himself up into the street and they shot him again."[12]

On or around August 18, 1994, Walling was arrested for a probation violation and held in custody in Fairfield. On August 25, 1994, Hussey called Detective Richard Lauthier, the lead investigator on the case, and said she wanted to make a statement. She went to the place where Walling was being held and spoke privately with him. Thereafter, they made a joint videotaped statement in which Hussey recounted the story she had heard from Brown.[13] On October 20, 1994, Lauthier interviewed Hussey alone. She re-told the story she had heard from Brown.

On October 29, 1994, Detective Lauthier interviewed Wagner. On November 1, 1994, Wagner's mother, who knew he had been involved in the drug scene, saw him at a Motel 6 in Fairfield; he seemed scared, but sober. She never saw him again. On December 16, 1994, Wagner's father filed a missing persons report naming him. Wagner's mother notified the police around that time that Wagner had been involved in a dispute with a relative.

---

[12] Brown testified that she never made any such statement to Hussey or heard any such statement from Carvalho. Carvalho testified that she never made any such statement to Brown.

[13] Walling told the police that John Wagner had said he was in a car driven to the murder scene on August 8, 1994, by Carvalho, and was dropped off somewhere near the scene after the killing. Walling was unavailable at trial.

The portion of the videotape including the statements was not played for the jury (possibly because the sound quality was "terrible"). However, the first portion of the videotape, in which Hussey and Walling were alone together and very affectionate toward each other, was played without sound for the jury as a defense exhibit to impeach Hussey's testimony that she and Walling were "just friends."

District Attorney's investigator Ron Garverick testified that he had tried to determine Wagner's whereabouts, but no information subsequent to the missing persons report had turned up to indicate that Wagner might still be alive. He also tried to find Walling, who had left the state, but was unsuccessful.

Carvalho testified under a grant of immunity. She denied that she or defendant had anything to do with the death of Agustin. She claimed that on the day of the crime they were eating dinner with her parents (now deceased).

Defendant did not present any evidence.

*Renewed Request for Dismissal and Instruction*

After the People rested, defense counsel raised the following observations from trial as further proof of prejudice from the delay and renewed his request for dismissal: (1) An officer who responded to the dispatch on the night of the crime testified that he could not remember to whom he had spoken at the Rio Vista Police Department, or whether it was that department or the California Highway Patrol who had dispatched him. (2) Telephone records showing with whom the victim spoke when he called from Cynthia Hylton's home on August 8, 1994, were no longer available. (3) It was no longer possible to track down the person from whom the victim borrowed money on that date. (4) Carvalho's parents, who might have been able to corroborate defendant's alibi, were now dead, and no one had ever taken statements from them.

The trial court did not explicitly rule on the renewed request for dismissal, but indicated that it would inform the jury regarding the lack of a transcript.

Ultimately, the trial court instructed the jury:

"You have heard testimony in this case concerning the government's failure to preserve certain evidence. The failure of the government to preserve this evidence may be relevant to the issues presented by this case. In evaluating the credibility and weight of the evidence, you may consider the government's failure to preserve certain evidence, specifically the preliminary hearing transcript of People versus Andrea Carvalho, December 8, 1994, and the dispatch record of

9

various government agencies to the scene of the incident which is the subject of this case, the discovery of the body of Michael Agustin. [¶] From the fact that the government did fail to preserve such evidence, you may draw an adverse inference against the government, which may leave you with a reasonable doubt as to the defendant's guilt. It is for you to determine whether to draw an adverse inference from the government's failure to preserve evidence. It is also for you to decide the weight, if any, to be given to the government's failure to preserve such evidence."

## DISCUSSION

### I

### *Denial of the Pretrial Motion to Dismiss*

Defendant first contends the trial court erred by denying his pretrial motion to dismiss because he established prejudice from the delay in prosecution and the People failed to justify the delay; he further contends that the court's instruction on the failure to preserve evidence was an insufficient remedy. The People respond that the record shows no prejudice to defendant from the delay and, even if there were prejudice, the People's justification was sufficient. Defendant responds that a holding of no prejudice would represent a factual finding contrary to the trial court's and the People have not made the appropriate arguments necessary to obtain that result.

As we will explain, because we conclude that defendant failed to show prejudice from the delay, we do not reach his remaining contentions.

A.     *The Law*

The state and federal Constitutions guarantee a criminal defendant's right to a speedy trial, and both guarantees operate in state criminal prosecutions. (*Martinez, supra*, 22 Cal.4th at p. 754.) Under the federal Constitution, the speedy trial right takes effect only when the defendant is formally charged by indictment or information, or when he is arrested and held to answer. (*Martinez, supra*, at p. 755.) Under the state Constitution, however, the filing of a felony complaint triggers the speedy trial right. (*Id.* at p. 754.)

Under state law, prejudice after the filing of a complaint and before the filing of an indictment or information is not presumed from the mere fact of delay. The defendant must affirmatively demonstrate prejudice. (*Martinez, supra*, 22 Cal.4th at p. 767; *People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1327 (*Mirenda*).) Once the defendant has done so, the burden shifts to the People to justify the delay. (*Martinez, supra*, 22 Cal.4th at pp. 766-767; accord, *People v. Lowe* (2007) 40 Cal.4th 937, 942 (*Lowe*).)

If the defendant shows even minimal prejudice, and the People's proffered justification for the delay is insubstantial, dismissal may be required. However, the trial court must balance the prejudice from the delay against its alleged justification only if the defendant has shown actual prejudice. (*Lowe, supra*, 40 Cal.4th at p. 942; *Mirenda, supra,* 174 Cal.App.4th at pp. 1327-1328.)

The same balancing test applies to claims that the delay in prosecution resulted in a denial of the right to due process and a fair trial under the state and federal Constitutions. (*People v. Catlin* (2001) 26 Cal.4th 81, 107 (*Catlin*); *People v. Boysen* (2007) 165 Cal.App.4th 761, 772 (*Boysen*).)

Prejudice, under both the speedy trial standard and the due process standard, may be shown from the loss of evidence, whether from the loss of material witnesses or from fading memory attributable to the delay, sufficient to hinder the defendant in preparing a defense. (*Catlin, supra*, 26 Cal.4th at p. 107.)

We uphold the trial court's ruling on appeal if supported by substantial evidence. (*People v. Alexander* (2010) 49 Cal.4th 846, 874; *People v. Hill* (1984) 37 Cal.3d 491, 499.) If the ruling is correct on any theory of law applicable to the case, it must be sustained regardless of whether the court's reasoning in support of the ruling is correct. (*Mirenda, supra*, 174 Cal.App.4th at p. 1330.)

### B.    *Analysis*

#### 1.    **Pretrial Ruling**

Here, the trial court found defendant had shown actual prejudice from the 17-year delay in prosecution based on the lack of a transcript from Carvalho's preliminary hearing and the destruction of police dispatch logs from the date of the crime. The absence of these items at trial does not support a finding of prejudice.[14]

First, the record does not show that the lack of a transcript from Carvalho's preliminary hearing is attributable to the delay in prosecution. The People declared that preliminary hearings where defendants were not held to answer were not transcribed unless a party requested it. Defendant's claim that a transcript once existed but was destroyed was based only on a hearsay assertion by a person who did not testify or submit a declaration on the motion to dismiss, as we explained at footnote 8, *ante*.

Even were we to assume a transcript did exist at one time, its absence at trial did not translate into a finding that the delay in prosecuting defendant *prejudiced* him. The People's failure to show probable cause to hold *Carvalho* over had no apparent tendency to exculpate *defendant*. Although defendant asserted that Carvalho had somehow impeached the version of events told by his accusers, he presented no evidence in support of the assertion. Nor did he explain *how* the accusers' version had been impeached, or why it was more difficult to impeach that story in 2011 than in 1994. In short, the absence of a preliminary hearing transcript in Carvalho's case did not establish that the delay in prosecution prejudiced defendant.

---

[14] Although defendant argues that we were asked by the People to "re-decide an issue of fact" by claiming that defendant failed to show prejudice, we disagree and construe the People's argument that "the delay did not prejudice [defendant]" as an integral part of the People's argument that the trial court correctly denied defendant's motion to dismiss.

Similarly, the destruction of the police dispatch logs did not establish prejudice. The police reports from 1994 were preserved, and the officers who initially investigated the crime testified regarding the details of their dispatch to the crime scene. The record is devoid of an explanation for how the missing dispatch logs could have even speculatively impeached the officers' testimony regarding the details of their dispatch to the murder scene, or how that testimony was even relevant to the larger question of defendant's culpability for the murder.

Further, we see no facts available to the trial court that it could have properly cited to support a finding of prejudice. The fact that two of the three key witnesses against defendant (Wagner and Walling) were unavailable for defendant's trial in 2011 forced the People to rely entirely on the double-hearsay account of Terri Hussey, whose credibility was suspect. The trial court properly discounted defendant's self-serving claim that his own memory had faded. Finally, defendant's speculations about failures to investigate the alleged threat to Wagner by his cousin, or the possible role of the mystery man who picked up Dale Allbright somewhere in the vicinity of the crime, did not tend to show that further investigation of these matters in 1994 as opposed to 2011 would likely have produced anything helpful to defendant.

In *People v. Zapien* (1993) 4 Cal.4th 929, 976, our Supreme Court upheld the trial court's ruling to admit evidence although the trial court gave an erroneous reason. The court noted: "'No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.)

We conclude that the trial court's finding of prejudice was error. However, the court properly denied defendant's motion to dismiss.[15] "[A] proper ruling on the motion to dismiss, supported by substantial evidence, will not be reversed even though the trial court gave an incorrect reason for that ruling. [Citation.]" (*People v. Gilchrist* (1982) 133 Cal.App.3d 38, 44.)

Since defendant failed to show prejudice, we uphold the trial court's ruling without considering the prosecutor's justification for the delay. (See *Lowe, supra,* 40 Cal.4th at p. 942; *Mirenda, supra,* 174 Cal.App.4th at pp. 1327-1328. ]

## 2. Motion for Reconsideration

Defendant's later argument for reconsideration based on evidence adduced at trial was similarly unpersuasive. Although he cited one failure of memory by a testifying officer, he failed to explain how that failure of memory tended to prove prejudice from the delay in prosecution. Similarly, defendant's references to persons the victim contacted on the date of the crime that could not now be tracked down and theory of third party perpetrators was entirely speculative and undeveloped. Finally, the fact that Carvalho's alibi for defendant could not be corroborated by evidence from her deceased parents was not proof of prejudice from delay, because there is no reason to presume that they would have corroborated the alibi or that they would have been credible had they done so. Therefore, none of defendant's arguments justified the requested relief of dismissal.

---

[15] To the extent defendant was entitled to any remedy based on the delay in prosecution, the trial court's instruction that the jury could choose to hold the absence of certain evidence against the People was sufficient.

## II

*Booking and Classification Fees*

Defendant contends that the trial court erred at sentencing by imposing a $287.78 main jail booking fee and a $59.23 main jail classification fee because the court did not find that he had the ability to pay those fees.  At the time of sentencing, defendant did not object to the fees' imposition.

The People argue defendant has forfeited any challenge to the fees at issue because he raised no objection to their imposition or amount in the trial court.  We agree. (*People. v. McCullough* (2013) 56 Cal.4th 589, 597; see also *People v. Crittle* (2007) 154 Cal.App.4th 368, 371.)  Accordingly, we conclude defendant has forfeited his claim.

### DISPOSITION

The judgment is affirmed.


           DUARTE           , J.


We concur:


        HULL           , Acting P. J.


        ROBIE           , J.