Filed 4/3/14  P. v. Hayes CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Appellant, | E057794 |
| v. | (Super.Ct.No. RIF1205953) |
| MICHAEL JEROME HAYES, | **OPINION** |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Harry A. Staley, Judge.

(Retired judge of the Kern Super. Ct. assigned by the Chief Justice pursuant to art. VI,

§ 6 of the Cal. Const.)  Reversed.

Paul E. Zellerbach, District Attorney, and Emily R. Hanks, Deputy District

Attorney, for Plaintiff and Appellant.

Boyce & Schaefer and Robert E. Boyce, under appointment by the Court of

Appeal, for Defendant and Respondent.

In 1972, the body of Mary Costa, a prostitute, was found in the desert. In 1976, one Diana Clark came forward; she told police that back in 1972, her then-husband — defendant Michael Jerome Hayes — showed her the body of a woman in the desert and confessed to killing her. However, the police were unable to corroborate Clark's account, and a deputy district attorney declined to prosecute, deeming the evidence insufficient.

In 2009, the police reopened the investigation. Now, in addition to Clark, two more of defendant's ex-wives said that he had admitted being culpable in the death of a prostitute in the desert. In 2012, defendant was charged with murder. On defendant's motion, however, the trial court dismissed the case. It ruled that the deaths of witnesses and the disappearance of evidence between 1976 and 2012 had impaired defendant's ability to present a defense — especially his ability to impeach Clark.

The People appeal. We will conclude that the trial court erred by dismissing the case. With one exception, defendant failed to show that the lost evidence and witnesses would have been helpful to the defense, or, even if they would have been helpful, that they were not cumulative. The sole exception is that defendant showed some prejudice in terms of his ability to investigate the possibility that Costa was killed by a third person. The prosecution, however, showed justification for the delay that was more than sufficient to outweigh this prejudice.

Defendant mounts a spirited attack on Clark's credibility. As he correctly notes: "Clark said the woman she saw was thin (Costa was heavyset), had blonde hair (Costa had dark brown or black hair), and was wearing dark shoes (Costa was barefoot and her

white sandals were found near her body.  Clark described seeing a bloody rock near Costa's head . . . .  Clark said the rock was about the size of a softball and could fit in the palm of a hand.  Police described the rock as weighing 40 pounds and the size of a soccer ball."  Defendant then complains that the passage of time "has eviscerated the ability of the defense to effectively impeach" Clark.  His argument, however, actually proves the opposite:  The evidence tending to impeach Clark is still available, at least in some form.

We are not saying that it is (or is not) a good idea to prosecute defendant for a murder 40 years past; that is not the issue before us.  The trial court expressed concern that, because evidence is missing, a trial would be "costly," "complicated," and "unreasonably prolong[ed]."  However, the decision to incur the expense of a trial, despite the possibility that defendant may be acquitted (or may even be factually innocent), is entrusted to the executive branch, which is entitled to exercise its prosecutorial discretion.  Our job is simply to determine whether, despite the passage of 40 years, defendant can still receive a fair trial.  Moreover, the burden is on defendant to prove that he cannot.  On this record, subjecting defendant to trial will not violate due process.

I

FACTUAL BACKGROUND

The following facts are taken from the evidence that was before the trial court when it ruled on defendant's motion to dismiss.  That evidence consisted of oral

3

testimony, declarations, exhibits, and the transcripts of defendant's two preliminary hearings  (see part II, *post*).

A.      *1972:  The Investigation of the Death of Mary Costa*.

On March 12, 1972, a group of people found a body on the northwest corner of Avenue 20 and Cottonwood Road, north of Palm Springs.

Sheriff's Deputy David Dupree responded to the scene.  He described the area as mostly undeveloped lots, though there were a few houses several blocks away.

He saw the body of a woman some five to fifteen feet off the road.  She was lying face down, with her head to the north.  She appeared to be in her 20s.  She was five feet four inches tall and "heavyset", with dark hair.  She was wearing a two-piece outfit with a floral pattern.  A pair of white sandals was lying about 20 feet away.  There was a spot of blood on the sandals.

Decomposition and partial mummification indicated that the body had been there for one to five weeks.  Animals had "tor[n] apart" the right shoulder.  There was a patch of body fluids some distance away, indicating that the body had been moved, perhaps by the animals.

A rock with a "[b]ig spot of blood on it" was found nearby.  According to Deputy Dupree, the rock was the size of a soccer ball; it would have taken two hands to pick it up.  The blood on the rock was tested and found to be type A.

Dr. Dollinger, a pathologist, came to the scene.  That same day, he also conducted an autopsy.  He was unable to determine a cause of death.  There were no gunshot

4

wounds or knife wounds. Tests for narcotics were negative. However, he did note that the left cheekbone was broken, which led him to suspect homicide. He found another fracture at the back of the skull.

The body was identified as that of Mary Costa by a broken incisor, a devil tattoo on the right thigh, and a distinctive ring.

One of Costa's friends, Loura Angel, said that she had not seen Costa since February 1972. Angel also told Deputy Dupree that Costa worked as a prostitute.

Unnamed friends of Costa reported spending the evening with her on February 27.

Steve Stewart, one of Costa's friends, said that the last time he saw her, she was wearing the same dress, bra and panties that were found on her body, suggesting that it was the night before she died. That night, according to Stewart, Costa was drinking and dancing at a bar called the Red Baron. At some point, Costa got into an argument with a barmaid named Syd. Stewart and Costa had breakfast at a Denny's, where two Filipino men came in and talked to her.[1]

Deputy Dupree learned that Costa had been involved in a narcotics "buy program" in Kern and Tulare Counties and had "given information against people[.]"

An inmate named Barbara Schwartz reported that other inmates claimed to have beaten up one "Mary Cota" [*sic*] and dumped her by the side of the road in a desert area. Deputy Dupree interviewed some of the inmates whom Schwartz accused. However,

---

[1] This was variously characterized as a "contact," a "discussion," a "conversation," and a "confront[ation]."

5

because Schwartz was a classic "jailhouse snitch," and because the description of the victim did not match Costa, he concluded that Schwartz's information was not reliable.

Someone (probably Loura Angel) said that Costa had gotten "a couple [of] scratches" in a fight with "somebody."

One Marianne Myers reported hearing from her daughter that a girl had died from an overdose at the daughter's birthday party on February 19, and that her body had been dumped in the desert.

Costa lived in an apartment with Macker (Max) Judulang and Alex Carrino. She was in a relationship with Judulang. Deputy Dupree participated in a search of Judulang's apartment pursuant to a search warrant. The police saw stains that could have been blood on a carpet, a suitcase, and a broom; hence, they took samples of each of these items. However, the items were tested and no blood was found.

At the same time, Costa was also in a relationship with one Tony Guillermo.

B.      *1976: The Investigation of Diana Clark's Statements*.

As of 1972, when Costa's body was found, defendant was living with Diana Clark. In 1973, they were married. In 1974, they separated.

By 1976, Clark had a boyfriend named Michael Angell. She told Angell that defendant had confessed to a murder. Angell told his father, attorney Jim Angell, and his father told the police.

6

As a result, on December 21, 1976, Sheriff's Deputy Ronald Dye interviewed Clark. The interview was audiotaped. Part of the audiotape was unintelligible, because the recording equipment malfunctioned, but there was a transcript of the rest.

Clark said that, as of 1972, defendant was working at a bar called the Casbah.[2] One day when she was "about 5 1/2 months pregnant,"[3] defendant came home from work some time after 2:00 a.m. He had "sand all over him." He was "visibly upset." He said "he had hurt somebody" and "[h]e wanted to show her."

Defendant drove her to "a remote site north of Palm Springs."[4] On the way there, he told her he had killed someone.

When they arrived, it was "very dark." Defendant left the car headlights on and led Clark to the body of a woman. The body was lying face down, with the head to the south. Clark described the dead woman as being in her 20s, with tinted or bleached

---

**2** In 2010, Clark told police that defendant had been working at the Biltmore Hotel. They interviewed defendant, who likewise said he had been working at the Biltmore. In 2012, however, Clark again said defendant had been working at the Casbah.

One possibility is that the Casbah may have been inside the Biltmore, but the record is conflicting and confusing on this point.

**3** Clark gave birth to a son on July 11, 1972. This would date the incident she was describing to April 1, 1972, give or take two weeks or so.

**4** In 2012, Clark described the site as "undeveloped," "an area . . . where people would possibly buy land to build a house on." She testified that there were no houses or buildings "in the immediate area."

blonde hair[5] and dark brown or black shoes. Deputy Dye showed Clark a photo of Costa's clothing, but she could not identify it.

There was blood on a rock next to the woman's head. According to Clark, the rock was "maybe a hair larger" than a softball, and it would "fit in . . . a man's hand . . . ."[6]

Defendant asked Clark to help him move the body. She refused and went back to the car. Once there, she threw up. She heard sounds of "brush rustling." About five minutes later, defendant, too, came back to the car. They left and went home.

Defendant explained that he had been going to rob the girl, but she resisted, so he killed her. At one point, Clark told police that defendant said that he hit the girl with a rock. Later, however, she told police that defendant said that he intended to hit the girl with a rock, but he ended up choking her instead. He said he got only seven dollars from the robbery.

Both defendant and Clark kept checking the newspapers to see if the body had been found. A couple of weeks later, Clark saw a newspaper article saying that a body "had been found on some desert property by a real estate agent and a couple who were

---

[5]    In 2012, Clark further described the body as "thin" and of "[a]verage" height, which she defined as five feet four to five feet six inches.

[6]    Clark testified that Deputy Dye told her that the police still had the rock. He took a rock out of a box and showed it to her. It looked the same as the rock she had seen.

Deputy Dye testified, however, that he never saw the rock and he never showed it to Clark.

looking for property . . . ." The article also said that the dead person had been in her 20s and may have been a prostitute. It said that she had died of natural causes, but, Clark added, "[S]he knew it wasn't true . . . ."

Defendant told Clark that, if she told anybody about the murder, he would kill her and her unborn child. Whenever they argued, defendant would say, "Just remember the girl in Palm Springs."

In July 1975, defendant told Clark he was going away and she would never see him again. By December 1976, she had not seen him for a long time, so she felt it would be safe to talk about the murder.

Clark guided Deputy Dye along the route that she said defendant had taken to the site of the body. On the way, according to Deputy Dye, sometimes she told him to turn or to drive a certain way before correcting herself and telling him to go back. (Clark denied this. ) Eventually, she told him to stop at Avenue 20 and Cottonwood Road. Avenue 20 and Cottonwood was about a block from Avenue 20 and Mountainview, where the body was actually found.

Clark took a polygraph test, which indicated that she was not lying.

At Deputy Dye's request, Clark made a pretext call to defendant. The call was audiotaped. Clark told defendant that the police were asking her questions about the murder. He replied, "I don't know what you're talking about."

Deputy Dye obtained copies of several articles about the case that had appeared in local newspapers.

9

Deputy Dye learned that defendant was living in or near New York. When Deputy Dye was going to New York for other reasons, he tried to get approval from his supervisors to contact defendant. However, he was unable to do so because, at the time, "they were extremely involved in other significant issues."

The investigation came to a halt because a deputy district attorney determined that there was insufficient evidence.

C.      *2009-2012:  The Reopened Investigation.*

In 2009, Sergeant Brett Seckinger reopened the investigation. He interviewed both Clark and defendant. Defendant denied having anything to do with Costa's death (though Sergeant Seckinger characterized his denials as "weak").

Meanwhile, Investigator Christine Emmens interviewed two of defendant's ex-wives. According to one ex-wife, defendant said that "when he lived out [w]est in the desert," a prostitute "did him wrong." The prostitute "went out into the desert and 'never came back.'" According to the other ex-wife, defendant physically abused her and told her he would kill her if she told anyone about the abuse. He added that "it wouldn't be the first time he had killed someone . . . ." He claimed "he had murdered a girl and dumped her body in the desert."

D.      *Missing Evidence.*

By the time of the hearing on the motion to dismiss, Macker Judulang, Tony Guillermo, Steve Stewart, and Jim Angell had all died.

10

Some evidence had gone missing, including: (1) the audiotape of Deputy Dye's 1976 interview of Clark; (2) the audiotape of Clark's polygraph examination; (3) the audiotape of the pretext phone call; (4) the rock; (5) Costa's skull; (6) the samples of a carpet, a suitcase, and a broom taken from Judulang's apartment; and (7) defendant's Biltmore Hotel employment records.

Photos still existed showing Costa's body, her clothing, her skull, the rock, and other "items found in the area."

Loura Angel and Michael Angell were still available. The report from Clark's polygraph examination was still available. Costa's clothing and sandals were still in police custody.[7] Indeed, in 2011, Sergeant Seckinger had these items tested for DNA, but no DNA was found. The coroner's investigation report, a toxicology report, and the report on a postmortem dental examination were still available. Finally, newspaper articles published in March 1972 regarding the case were still available.

## II

## PROCEDURAL BACKGROUND

In January 2012, defendant was charged by complaint with one count of murder. (Pen. Code, § 187, subd. (a).) After a preliminary hearing, he was held to answer. He filed a motion to dismiss based on preaccusation delay. The prosecution filed an

---

[7]     As of 2010, the box of evidence from the scene also contained a blonde wig. This could potentially explain Clark's description of the victim as blonde.

11

opposition to the motion. While the motion was pending, the prosecution dismissed the case.

The prosecution then refiled the case almost immediately.[8] Defendant just as promptly refiled his motion to dismiss. The prosecution filed another opposition to the motion. Meanwhile, the trial court held a second preliminary hearing, and once again, defendant was held to answer.

In October 2012, the trial court held an evidentiary hearing on defendant's motion to dismiss. In November 2012, it issued a detailed written opinion granting the motion. It found that defendant was prejudiced by Clark's faded memory, by the loss of physical evidence, and by the deaths of police officers, coroner's officials, and potential witnesses. It further found that there was insufficient justification for the delay, in that the prosecution's justification was "weak," while "[t]he prejudice to the defendant [wa]s strong." Finally, it found that the prosecution had not shown that any lesser sanction would "ameliorate the existing prejudice to the defendant in any significant degree." Hence, it dismissed the case.

---

[8]    Defendant accuses the prosecution of "blatant forum[-]shopping." If that is indeed what the prosecution was up to, it failed miserably, as defendant's motion was ultimately granted by the second judge. In any event, defendant does not explain how forum-shopping is relevant to the issues before us.

12

III

DISCUSSION

A.    *Applicable Legal Standards*.

A defendant whose speedy trial rights have been violated may be entitled to a presumption of prejudice.  (*People v. Williams* (2013) 58 Cal.4th 197, 234.)  This is, in part, because "'impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown,"' and 'we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.' [Citation.]" (*Id*. at p. 236.)  However, "'[a] defendant's state and federal constitutional speedy trial rights [citations] do not attach before the defendant is arrested or a charging document has been filed.' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 921.)

By contrast, "'[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.  A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay.  The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.  [Citations.]' [Citation.] '"In the balancing process, the defendant has the *initial* burden of showing some prejudice before the prosecution is required to offer any reason for the delay [citations].

13

The showing of prejudice requires some evidence and cannot be presumed. [Citations.]"' [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 874.)

"'[N]egligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process. This does not mean, however, that whether the delay was purposeful or negligent is irrelevant.' [Citation.] Rather, 'whether the delay was purposeful or negligent is relevant to the balancing process. Purposeful delay to gain advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation.' [Citation.] The justification for the delay is strong when there is 'investigative delay, nothing else.' [Citation.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 431.)

"'We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation].' [Citation.]" (*People v. Jones*, *supra*, 57 Cal.4th at p. 922.)

B.      *The Prejudice to Defendant*.

1.      *The tapes of Clark's 1976 statements*.

The trial court found that defendant was prejudiced by the loss of the tapes of Clark's 1976 statements.

14

Those statements, however, were memorialized in police reports. Deputy Dye had an independent recollection of them (albeit likely refreshed by the reports). There was even a partial transcript of Deputy Dye's original interview of Clark on December 21, 1976. It was partial, not due to any delay by the prosecution, but only because, in 1976, the recording equipment malfunctioned.[9]

In the trial court, defense counsel argued essentially that prejudice should be presumed: "How could I possibly make that showing [i.e., that the tapes would impeach Clark] when the evidence has been destroyed? . . . All of that is lost. All I have is a police report . . . ." However, "[n]o presumption of prejudice arises from delay after the filing of a complaint and before arrest or formal accusation by indictment or information [citation]; rather, in this situation a defendant seeking dismissal must affirmatively demonstrate prejudice [citation]." (*People v. Martinez* (2000) 22 Cal.4th 750, 755.) "Presuming prejudice would be inconsistent with the Legislature's declining to impose a statute of limitations for murder, among the most serious of crimes. To avoid murder charges due to delay, the defendant must affirmatively show prejudice." (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250.)

In *People v. Alexander*, *supra*, 49 Cal.4th 846, the defendant claimed that he had been prejudiced by preaccusation delay; he noted that, among other things, audiotapes of

---

**9** Defendant also claims that a 1981 interview of Clark was missing. There was no such interview. The cited reference in the reporter's transcript is to a *form* that Deputy Dye filled out in 1980 or 1981, asking that the tape of the 1976 interview not be destroyed.

interviews with hypnotized witnesses had been erased.  (*Id*. at pp. 874-875.)  The Supreme Court rejected this claim, stating:  "To the extent defendant argues the tapes may have included statements not contained in, or that contradicted, the investigators' reports or witnesses' testimony at the preliminary hearing or trial, his claim is based on speculation, not proof of actual prejudice.  To the extent the tapes contained the same statements contained in the reports and testimony of the witnesses, they would have been cumulative.  To the extent the reports and witness testimony conflicted, defendant was able to point out the inconsistencies to the jury without the tapes.  Although . . . it might have been preferable to save the tapes, defendant has not demonstrated that he actually was prejudiced by their destruction."  (*Id*. at p. 875.)

Here, there was absolutely no evidence that there was anything on the tapes that would impeach Clark (other than what was already in the partial transcript or the police reports).  Much as in *Alexander*, defendant's argument that the lost tapes may have contained statements that would have impeached Clark was based on speculation.  In its written order, the trial court duly noted the rule that prejudice should not be presumed.  Nevertheless, it does not seem to have followed that rule, as it repeatedly presumed that any missing evidence would have impeached Clark.  This was error.

### 2. *Clark's polygraph test*.

The trial court found that defendant was prejudiced because all records of Clark's polygraph test had been lost.

16

At the first preliminary hearing, in September 2012, Sergeant Seckinger testified that he had not been able to find any record of the polygraph test.[10] In October 2012, however, Investigator Emmens testified that she had obtained "additional reports" from the Sheriff's Department, including the polygraph examination report. She was able to quote particular questions and answers from it; she testified that it "indicated no deception." On this record, the trial court erred by finding that the evidence of the polygraph test had been lost.

In any event, evidence of the polygraph test would be inadmissible. The fact that Clark took the test, along with the results of the test, would be inadmissible under Evidence Code section 351.1, subdivision (a).[11] Clark's statements during the test, if offered for their truth, would be inadmissible hearsay. They could not come in as impeachment evidence or as prior inconsistent statements (Evid. Code, § 1235), because it appears that they were perfectly consistent with Clark's testimony.

In sum, defendant has not shown that he was prejudiced.

---

[10] Sergeant Seckinger also testified that he had not been able to find an audiotape of the polygraph examination. However, there was no evidence that it was, in fact, audiotaped.

[11] This subdivision, as relevant here, provides: "[T]he results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . , unless all parties stipulate to the admission of such results."

17

### 3. *The tape of the pretext call.*

The trial court found that defendant was prejudiced because the tape of the pretext call had been lost.

It is true that the tape had been lost.[12]  However, it is undisputed that, in the pretext call, defendant denied knowing anything about a murder.  Defendant argues that the tape itself is necessary to show his "demeanor."  He notes that Sergeant Seckinger characterized his denials in 2011 and 2012 as "weak."  He argues that the tape would show that his denials in 1976 were not weak.  This is comparing apples to oranges.  Nobody was claiming that his denials in 1976 were weak.  Quite the contrary, Clark quoted him as saying flatly, "I don't know what you're talking about."

In any event, it does not appear that the tape would be admissible.  Defendant's denial of the crime is inadmissible hearsay.  It would not be admissible as a prior consistent statement because, even in 1976, defendant had a motive to make a false denial.  (Evid. Code, §§ 791, subd. (b), 1236.)

### 4. *The rock.*

The trial court found that defendant was prejudiced because the blood-stained rock had been lost.[13]

---

[12]    The trial court also found that "a malfunction of the taping system is claimed by law enforcement to have resulted in not all of the conversation being preserved on tape at that time."  Actually, the malfunction occurred during Deputy Dye's interview with Clark, not during Clark's pretext phone call with defendant.

[13]    Defendant claims that the rock was "last seen being used as a doorstop at the sheriff station."

*[footnote continued on next page]*

18

The size of the rock was relevant to impeach Clark. She claimed that the rock was softball-sized and would fit in a man's hand. Deputy Dupree testified, however, that it was soccer-ball-sized and it would take two hands to lift it. Defendant was not prejudiced, however, precisely because Deputy Dupree could and did testify regarding the size of the rock.[14]

The trial court also noted that "the blood on the rock is no longer available for DNA analysis." In 1976, however, DNA profiling did not exist yet. (See *People v. Axell* (1991) 235 Cal.App.3d 836, 842 [case "of first impression" regarding admissibility of DNA profiling evidence].) Thus, the delay did not prejudice defendant in this respect.

Defendant now argues that the presence or absence of tissue on the rock would be relevant. However, he did not offer any expert testimony that hitting someone with a rock would leave tissue on the rock, or that such tissue would still be detectable after weeks of exposure to the elements — much less that this was so likely that the *absence* of tissue would prove that the rock had *not* been used to hit someone.

---

*[footnote continued from previous page]*
Deputy Dye admitted "hear[ing] that at one point it had been used as a doorstop," but he added: "I've never been able to attribute that comment to anybody nor do I have any recollection of having seen it as such."

[14]     The People assert that "multiple pictures of the now-missing rock . . . exist *documenting its size* and shape." (Italics added.) The only evidence on this point, however, was Investigator Emmens's testimony, "I have reviewed . . . photographs depict[ing] . . . the rock . . . ." It is not clear whether these photos indicate the rock's size.

Defendant also argues that the pattern of blood on the rock — "whether splatter, smear or drop down" — would be relevant. Again, however, he did not offer any expert testimony on this point. At least to a layperson, the presence of a splatter or a drop rather than a smear would hardly seem to prove that the rock was *not* used as a weapon. In any event, while the photos themselves are not in evidence, it seems almost inconceivable that the police took photos of the rock, yet positioned the camera so that they did *not* show the blood.

Finally, as the People note, the trial court could have minimized any possible prejudice by instructing the jury that the People were responsible for the disappearance of the rock, and hence the jury could infer that the rock would have afforded evidence adverse to the People's case. (See *People v. Conrad* (2006) 145 Cal.App.4th 1175, 1185-1186 [jury instruction can be adequate remedy for preaccusation delay, by analogy to cases of destruction of evidence]; *People v. Wimberly* (1992) 5 Cal.App.4th 773, 791-793 [where police had destroyed evidence in violation of a discovery order, trial court properly instructed the jury that it could draw an adverse inference that may be sufficient to raise a reasonable doubt].)

       5.    *Costa's skull*.

The trial court found that defendant was prejudiced because Costa's skull had been lost.

However, photos showing "Costa's fractured skull" were still available. So was a coroner's investigation report noting the fractured cheekbone but concluding that the

20

cause of death was undetermined. In addition, police reports memorializing the finding of both a fractured cheekbone and a fracture at the back of the skull were still available. On this record, it is sheer speculation to suppose that the skull itself, if still available, would impeach Clark by revealing some cause of death *other than* being choked and hit with a rock. Indeed, in 1972, even *with* the skull, a cause of death could not be determined.

6.      *Costa's clothing*.

The trial court found that defendant was prejudiced because Costa's clothing had been lost, and thus it could not be used to impeach Clark's description. The trial court was mistaken. Costa's clothing — including her dress and sandals — was still in police custody. So were photos of Costa's body taken at the scene.

In any event, even in 1976, Clark did not remember what Costa was wearing. All she remembered was that Costa's shoes were dark. Actually, Costa's sandals were white; this was shown by Deputy Dupree's testimony, as well as by the sandals themselves. Thus, to the extent that Costa's clothing was impeaching, defendant was still free to use it to impeach.

7.      *Items from Judulang's apartment*.

The trial court found that defendant was prejudiced because the items seized in a search of Judulang's apartment — a piece of a rug, a piece of a suitcase, and a piece of a broom — had been lost. These items were seized, however, only because they bore stains that could have been blood. They had subsequently been tested, and no blood was

21

found. The idea that retesting by the defense might have produced a different result is the epitome of speculation. Thus, it does not appear that their loss was prejudicial.

### 8. *Medical reports*.

The trial court found that defendant was prejudiced because medical reports had been lost.

The coroner's investigation report, a toxicology report, and a dental report were still available. There is no evidence that any other medical reports ever existed. Arguably, from the fact that Dr. Dollinger conducted an autopsy, the trial court could infer that there was, at one time, a separate autopsy report. Even if so, however, it is clear from the coroner's report that there were no knife wounds and no gunshot wounds and that it was impossible to determine a cause of death. Defendant cannot show that there was any helpful information in the autopsy report that is not also in the coroner's investigation report (or otherwise available).

For example, in finding prejudice, the trial court speculated that missing medical reports might have shown that Costa's hair was dark, impeaching Clark's testimony that it was blonde. Deputy Dupree, however, who saw the body, testified that Costa's hair was dark. Moreover, photos of the body showed that Costa had dark hair. Hair samples collected at the scene were still available. Thus, defendant was not prejudiced.

The trial court also noted that there were no medical records indicating whether Costa was choked. However, this appears to be due, not to the absence of records, but rather to the torn, mummified, and decomposed condition of her body when it was found

22

in 1972.  In 1976, when Clark first asserted that Costa was choked, if the police could have cross-checked that claim against the medical records, surely they would have. There is no evidence that the difficulty in determining whether Costa was choked is due to the passage of time since 1976.

9.     *The deaths of the coroner and deputy coroner.*

The trial court found that defendant was prejudiced because "the pathologist who performed the autopsy and other coroner officials" had died.

In the proceedings below, defendant asserted that the coroner, Dr. F. Rene Modglin, and deputy coroner, Ray Carrillo, had died.  Although he introduced no evidence of this, the People did not dispute it.  However, there was also no evidence as to how these two gentlemen were involved in the case.  The evidence did show that one Dr. Dollinger examined the body at the scene and later conducted an autopsy.  There was no evidence that Dr. Dollinger was dead.[15]  In the absence of any evidence of the nature of any information that Modglin or Carrillo may have had before they died, there is no factual basis for the trial court's finding of prejudice.

Separately and alternatively, we note that Dr. Dollinger was never able to determine a cause of death.  As the People point out, the difficulty of determining a cause of death was due, not to the fact that the prosecution delayed bringing charges, but rather to the fact that the body was dumped in the desert and was not found for weeks, allowing

---

**15**     Defendant asserts in his brief that Dr. Dollinger is deceased.  However, the cited portions of the record do not support this.

23

it to decompose and allowing animals to disturb it. Thus, defendant cannot show that, even if Modglin and Carrillo were still available to testify, he would be any better off.

10. *Law enforcement officials.*

The trial court found that defendant was prejudiced by the deaths of "law enforcement officials who would be expected to have made observations of the deceased at the scene that contradict those of . . . Clark."

There was no evidence that any of the law enforcement officers involved were dead. However, there was evidence that some could not be located. A defense investigator testified that he tried to locate some 75 "law enforcement witnesses," but was unable to do so. There was no evidence, however, that any of these officers were at the scene of the crime or able to observe the body.

But even if they were, Deputy Dupree was also there. He could and, in fact, did testify to details that contradicted Clark's account. Indeed, Deputy Dupree and the physical evidence addressed basically all of the details that Clark was able to remember and either confirmed or contradicted them. It would be purely speculative to suppose that other officers at the scene (if any) would have given an account that was any different from Deputy Dupree's.

Investigator Terry Burdo (or Berdo) had been present when Deputy Dye interviewed Clark as well as when Clark guided Deputy Dye to the scene. Investigator Burdo no longer had any memory of the case. However, it appeared that his testimony

24

would be merely cumulative. Thus, once again (see part III.B.1, *ante*), the trial court erred by presuming that the missing evidence would impeach Clark.

11. *Newspaper articles.*

The trial court found that defendant was prejudiced because Clark could no longer identify the newspaper article that she read in 1972.

Clark admitted reading an article about the discovery of the body. If this article contained details that she later claimed to have perceived personally — e.g., details regarding the location or the appearance of the body — it would be relevant to impeach her. However, at least seven newspaper articles about the case, published in March 1972 in the Press-Enterprise, the Daily News, the Daily Enterprise, and the Desert Sentinel, were still available. The defense will be free to use them to impeach Clark. As the People point out, there is no evidence that Clark was *ever* able to identify the *particular* article that she read. Thus, the trial court erred by finding that the passage of time had prejudiced the defense in this respect.

12. *Defendant's employment records.*

The trial court found that defendant was prejudiced by the loss of his employment records.

There was no evidence, however, that defendant's 1972 employment records still existed in 1976. One witness testified that the Casbah "might have been" torn down shortly after 1972, and the Biltmore was "gone" sometime before 1976.

25

More fundamentally, there was no evidence that the employment records would have helped the defense, by impeaching Clark or otherwise. It is undisputed that Clark was living with defendant in 1972, so she would have known where he worked and what his hours were, even assuming that she was making up all of the other aspects of her 1976 account. Moreover, defendant could hardly expect the employment records to provide him with an alibi, because Clark could not specify the date or day of the week when she saw the body. (See *People v. Catlin* (2001) 26 Cal.4th 81, 109 [where defendant was accused of poisoning his wife with paraquat, his inability to find alibi witnesses was "not highly significant, given his unlimited access to the victim and the circumstance that the paraquat could have been administered at any point over a lengthy period."].)

13.  *Clark's faded memory*.

The trial court found that defendant was prejudiced by Clark's lack of recollection of specified matters.

Some of these were matters that Clark had forgotten by 1976, such as the exact date when defendant took her to see the body, or the exact route that they took to get there. However, precisely because Clark had already forgotten these as of 1976, defendant was not prejudiced by further delay.

Others were matters that Clark simply did not mention in 1976. For example, the trial court found that, by 2012, Clark no longer remembered what shoes she wore to the scene. It concluded that "the defense is prevented from establishing that none of the footprints in the area were hers . . . ." However, there is no evidence that in 1976, Clark

26

did remember what shoes she was wearing.  Indeed, it seems extremely unlikely that she would.  Moreover, it does not appear that there were any shoeprints in the area; certainly they are not mentioned in connection with the 1972 investigation.  Thus, defendant did not carry his burden of showing prejudice.

Still others were matters that Clark still remembered — and affirmatively stated — in 1976.  For example, in 1976, Clark recalled that Costa had blonde hair.  By 2012, she no longer remembered Costa's hair color.  Likewise, in 1976, Clark was able to guide Deputy Dupree along the route she and defendant took to the scene.  By 2012, she did not remember it anymore.  As to these matters, however, defendant is not prejudiced at all.  As the People point out, Clark's 1976 statements can be admitted as past recollection recorded.  (Evid. Code, § 1237.)  Any contradictory evidence can then be introduced as impeachment.  (Evid. Code, § 1202.)

Finally, the trial court identified only one matter that Clark remembered, but did not specifically tell police, in 1976.  In 2012, Clark testified:

"Q  Do you remember around how far away th[e] car was from th[e] body?

"A  In '76 I could have told you, but I can't right now.  It wasn't that far."

The trial court reasoned:  "Ms. Clark indicated she got sick and vomited at the side of the car.  [Citation.]  Her lack of memory of the car's location and the extensive delay deprive the defense of the opportunity to impeach the accuracy of her statements by establishing a lack of evidence of residue of her claimed vomiting."

27

Also in 2012, however, Clark was asked to estimate how far she walked to get from the car to the body. She estimated the distance as 21 or 22 feet. Thus, it appears that she did, in fact, remember the location of the car. In any event, the defense could already impeach Clark with the fact that the police did not note any vomit in 1972.

The trial court's reasoning assumes that in 1976, the presence or absence of vomit could still have been established. The only evidence on this point, however, was that, in the one to five weeks that elapsed before the body was found, any vomit would have been "licked up" by dogs or coyotes in the neighborhood. Moreover, Clark made it clear that she vomited on the driver's side of the car, i.e., in the street. It is highly unlikely that the vomit from 1972 would still have been detectable in 1976. Thus, even if, in 1976, Clark had specified exactly where she vomited, and even if investigators had looked there but found no vomit, that evidence would have had only a negligible tendency to impeach Clark.

14. *Third-party culpability evidence*.

Finally, the trial court found that defendant was prejudiced because "[t]wo other possible suspects who were boyfriends of the deceased at the time, are now deceased." Defendant also argues, more generally, that he is prejudiced by his inability to conduct a "meaningful investigation of the multitude of third party suspects . . . ."

The 1972 investigation by Deputy Dupree did turn up a number of potential suspects:

28

1.  Costa "had been involved in a buy program with narcotics dealers and given information against people[.]"

2.  Costa had sustained "a couple [of] scratches" in a fight with somebody.

3.  On the night before she died, Costa was in an argument with a barmaid named Syd.

4.  Also on the night before she died, Costa was in a "conversation" (or a "confront[ation]") with two Filipino men at a Denny's.

5.  Judulang and Guillermo were Costa's boyfriends, and thus, to some extent, suspects a priori. The men at the Denny's could well have been Judulang and/or Guillermo, who were both Filipino. The police searched Judulang's apartment. As the search warrant affidavit shows, they did so more because Costa had lived there with him than because he himself was a suspect; however, among the items they were seeking were Costa's blood, hair, and teeth and any possible murder weapon. No evidence incriminating Judulang was found.

6.  An inmate claimed that other inmates admitted beating up one "Mary Cota" and dumping her in the desert. However, she was deemed unreliable because she was a "jailhouse snitch" and because the description of the beating victim did not match Costa.

7.  A witness reported hearing that a girl had died from an overdose on February 19 and that her body had been dumped in the desert. However, Costa had been seen alive as late as February 27, and tests of her body for narcotics were negative.

29

To summarize:  At the time, the police investigated each of these leads, but they were unable to obtain sufficient evidence to justify further investigation, much less prosecution.  There is no reason to think that the investigation was cursory or inadequate.  "[I]t is well settled that ""'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.'  [Citation.] . . .'"  [Citation.]"  (*People v. Hartsch* (2010) 49 Cal.4th 472, 496.)  The evidence gathered in 1972 fell short of this standard.  Nevertheless, if defendant had been charged in 1976, competent defense counsel would have wanted to do a further investigation in the hope of obtaining additional evidence that would be sufficient to raise a reasonable doubt about whether defendant was the perpetrator.

Guillermo died in 1973 — before Clark came forward in 1976, and thus before any supposed delay in prosecution.  However, the subsequent deaths of Stewart (the witness who saw the two Filipino men at Denny's) and of Judulang did prevent the defense from investigating other possible suspects.  The passage of time also made it effectively impossible to investigate the possibility that Costa was killed by someone she had bought drugs from or informed against.  We therefore conclude that defendant was prejudiced in this respect.  (See *People v. Boysen* (2007) 165 Cal.App.4th 761, 779-780 [upholding trial court's finding that defendant was prejudiced by inability to conduct further investigation or evidence of third party culpability].)

However, this was the *only* respect in which defendant was prejudiced, and given the implausibility of most of the supposed suspects, the prejudice was attenuated, at best.

C.     *The Prosecution's Justification for the Delay*.

"Under the balancing test, when a defendant demonstrates prejudice, the prosecution must offer justification for the delay.  Once the prosecution does so, the trial court balances the harm done the defendant against the justification.  [Citation.]  In a broad sense the trial court's task 'is to determine whether precharging delay violates the fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency.' [Citation.]

"In balancing prejudice and justification, it is important to remember that prosecutors are under no obligation to file charges as soon as probable cause exists but before they are satisfied that guilt can be proved beyond a reasonable doubt or before the resources are reasonably available to mount an effective prosecution.  Any other rule 'would subordinate the goal of orderly expedition to that of mere speed.'  [Citation.]

"The balancing task is a delicate one, 'a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial.  [Likewise], the more reasonable the delay, the more prejudice the defense would have to show to require dismissal.'  [Citation.]"  (*People v. Boysen*, *supra*, 165 Cal.App.4th at p. 777.)

"A court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges.  'The due process clause does not

31

permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment . . . . Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt . . . . Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused because investigative delay is not so one-sided. A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt.' [Citations.]" (*People v. Nelson*, *supra*, 43 Cal.4th at p. 1256.)

The trial court found that there was some justification for the failure to prosecute in 1976, i.e., a deputy district attorney had concluded there was insufficient evidence to file charges. However, it also found that this justification was "weak," because the police had an "available" suspect who had supposedly confessed and they could have investigated further.

It is not clear what further investigation the trial court felt was warranted. It asserted that defendant was "readily available to be questioned . . . ." That is not entirely true, as he was out-of-state at that point. In any event, the police did have Clark conduct a pretext call with defendant; in it, he denied knowing anything about a murder. There is no reason to suppose that, if they had contacted defendant directly, he would have been

any more forthcoming. Moreover, in 2010 and again in 2012, the police did interview defendant, and he did, in fact, simply deny any involvement.

Sergeant Seckinger never actually explained why he reopened the case in 2009. Once he did, though, what shifted the balance in favor of prosecution was that two of defendant's ex-wives both independently stated that defendant had admitted killing a girl in the desert. This evidence did not exist in 1976, when defendant had only recently broken up with Clark. Indeed, if the police had interviewed defendant about the murder in 1976, defendant would have been placed on his guard and might never have made the admissions to his ex-wives that he ultimately did make.

Defendant argues that his ex-wives' statements were "not properly before the court" because they were hearsay and because he objected to them. Although he did object to them, he did not object on hearsay grounds; thus, he forfeited this particular objection. (Evid. Code, § 353, subd. (a).) In any event, the statements were admissible for a nonhearsay purpose; regardless of their truth, they were relevant to show why the People decided to prosecute defendant.

The record shows that "[t]he delay was investigative delay, nothing else." (*People v. Nelson*, *supra*, 43 Cal.4th at p. 1256.) We therefore conclude that it was more than sufficient to justify the minimal prejudice that defendant was able to show.

## IV

## DISPOSITION

The order of dismissal is reversed, and the matter is remanded for further proceedings.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI _____

J.

We concur:

RAMIREZ _____

P. J.

KING _____

J.