Filed 9/11/14  P. v. Naposki CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G047282 |
|         v. | (Super. Ct. No. 09HF0844) |
| ERIC ANDREW NAPOSKI, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, William R. Froeberg, Judge.  Affirmed.

Mark David Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Defendant Eric Andrew Naposki and Nanette Ann Packard were charged with first degree murder, with an allegation they committed the crime for financial gain. The information also alleged defendant personally discharged a firearm during the commission of the crime. In a separate trial, Packard was found guilty as charged and the court sentenced her to prison for life without the possibility of parole. We affirmed her conviction. (*People v. Packard* (Jan. 30, 2014, G046934) [nonpub. opn.].) Another jury found defendant guilty of first degree murder and returned true findings on both the financial gain and discharge of a firearm allegations. The trial court sentenced him to prison for life without the possibility of parole, plus 4 years. On appeal, defendant contends the court erred by: (1) Denying his motion to dismiss the prosecution for undue delay in charging him with the crime; (2) refusing to discharge a juror who commented on his appearance during trial; (3) excluding a police officer's description of his reaction when he was questioned after the murder; and (4) giving an ambiguous instruction on the financial gain circumstance. Finding no prejudicial error, we affirm the judgment.

FACTS

Shortly after 9:00 p.m. on December 15, 1994, William McLaughlin, a divorced multimillionaire in his mid-50's, was shot to death inside his home located in a gated Newport Beach community. McLaughlin was struck with six 9 millimeter rounds, likely fired from a 92F series Beretta handgun. Kevin McLaughlin, the victim's adult son, who lived with him since suffering permanent injuries in an accident several years earlier, reported the shooting in a 9-1-1 call at 9:11 p.m.

At the time of the murder Packard, then in her 20's, also lived at the McLaughlin residence. McLaughlin had appointed Packard as the trustee of a trust, made her the beneficiary of a $1 million life insurance policy, and in his will he left her $150,000, a car, and the use of a beach house for a year after his death.

2

The prosecution's theory was that Packard coaxed defendant to kill McLaughlin for her financial benefit. Its case against defendant was based on circumstantial evidence.

In early 1994, Packard surreptitiously began stealing money from McLaughlin by forging his name on checks. About the same time, she became romantically involved with defendant, a former professional football player who was now in the security business.

When the police arrived at the McLaughlin home following the 9-1-1 call, they found a key in the residence's front door and a second key on the mat outside the door. The key on the mat fit the lock of a nearby pedestrian gate. During the initial investigation, the police learned Packard had a key to the house, but not to the gate. David Vandaveer, the owner of a Tustin hardware store testified that a month or two before the murder he made some keys for defendant. Vandaveer also said he likely made the key found in the front door. At the time, he used "a nice machine that would give a nice cut" and described the door key as having "a pretty decent cut."

At that time of the murder, defendant worked at a nightclub located only 450 feet from the pedestrian gate adjacent to the McLaughlin residence. An investigator testified it took him 2 minutes and 32 seconds to casually walk the distance between the gate and the nightclub.

When Packard arrived home the night of the murder, she told the police she had attended her son's soccer game in Walnut and then went shopping. She showed the police a sales receipt for a purchase made at a store in a nearby mall around 9:30 p.m. The next day, Packard telephoned Ross Johnston, her ex-husband, informing him the police might contact him to verify her "alibi" that she attended their son's soccer game. Claiming "he's not involved," Packard urged Johnston not to mention that defendant attended the soccer game with her. Johnston did inform the police that defendant was at

the game. But the police did not learn that Packard asked Johnston not to mention defendant until a cold case investigator re-interviewed Johnston in 2010.

Shortly after the murder, the police began surveillance of both Packard and defendant. Discovering defendant had an outstanding traffic warrant, the police stopped his vehicle and arrested him. Defendant was carrying a notebook that contained the license plate number for McLaughlin's car.

The police also conducted a recorded interview of defendant. He acknowledged attending the soccer game with Packard, but claimed she dropped him off at his Tustin apartment where he changed clothes and drove to work, arriving at the nightclub between 9:30 and 9:45 p.m. Defendant admitted buying a .380 caliber handgun, but said he gave it to his father. Then, without prompting, defendant mentioned recently acquiring a nine millimeter Beretta 92F handgun. Defendant claimed he loaned this gun to a man named Jimenez for a security job and Jimenez lost the weapon.

The police contacted Jimenez. According to Jimenez, defendant provided him with a .380 caliber handgun for the job. When defendant failed to pay him, Jimenez kept the weapon and later sold it to a third person. Jimenez recovered the gun and gave it to the police. In a second interview, the police confronted defendant with the discrepancy over the type of gun he loaned to Jimenez. Defendant admitted he "misled" the police because he "felt scared . . . ." He now claimed the nine millimeter weapon was taken from his vehicle but he "ha[d] no idea" when or what happened to it.

During the second interview, defendant also claimed that while driving to work on the night of the murder, he received a page from Mike Tuomisto, the nightclub's alcohol manager. He stopped at a Tustin restaurant and called Tuomisto from a pay telephone using a calling card. The defense was allowed to present evidence the phone call was purportedly made at 8:52 p.m.

The parties presented conflicting evidence on the length of time it would take to drive to the McLaughlin residence from (a) Walnut, (b) defendant's Tustin

4

apartment, and (c) the Tustin restaurant. The prosecution's evidence reflected that under any of these individual scenarios, there was enough time to arrive and commit the murder before 9:11 p.m.

The prosecution presented other circumstantial evidence supporting its theory of the case. In mid-1994, Packard and defendant met with an agent selling homes for a residential developer. The prices of homes in the development ranged between $800,000 and $2 million. The agent testified Packard and defendant gave her the impression they were married, telling her they had children. While expressing interest in purchasing a home, Packard and defendant said they would not be able to do so until early 1995.

Robert Cottrill worked as a personal trainer at an athletic club frequented by Packard and defendant in 1994. He testified the two were physically affectionate with each other at the club, holding hands and kissing. In the latter part of the year Cottrill and Packard discussed the possibility of her investing in a software program Cottrill was promoting. Packard said she wanted to put $100,000 into the venture, but needed time to obtain the funds from an off-shore account. After McLaughlin's murder, Cottrill and his fiancée made an anonymous telephone call to the police department providing the foregoing information. It was not until 2007 that a cold case investigator was able to identify Cottrill and obtain his cooperation in the case.

Suzanne Cogar lived in the same Tustin apartment complex as defendant in the latter part of 1994. She often saw Packard with defendant at the complex. During a November conversation, defendant complained to Cogar that Packard was living with a man who was making unwanted sexual advances towards her, coming into her bedroom and trying to sleep with her. Defendant said the man owned a private plane and he was going to blow it up.

Cogar testified she had a second conversation with defendant in January 1995. He asked if she had heard the man Packard was living with was shot to death.

5

Cogar responded, "'I don't even want to know if you did it or not.'" Defendant said, "'Maybe I did and maybe I didn't, and maybe I had someone do it.'" Although the type of weapon used to kill McLaughlin had not yet been publicly disclosed, defendant told Cogar he had "'the same kind of gun . . ., but they won't find that gun on me because I loaned it to a buddy . . . .'" Defendant also told Cogar that a key left in the door to the McLaughlin residence had been made at a Tustin store near the apartment complex. He urged Cogar not to speak with the police.

In early 1995, Cogar telephoned the police department, but when asked to call back and give a statement, she failed to do so. Three years later, she again called the police. This time she gave a statement over the telephone, but identified herself only by her first name and said she wanted to remain anonymous. It was not until she was contacted by the cold case investigator in 2008 that Cogar agreed to cooperate with the investigation. During the latter contact the police also first learned defendant told Cogar about the key found in the front door of the McLaughlin residence.

DISCUSSION

1. *Denial of the Motion to Dismiss*

The prosecution formally charged Packard and defendant with McLaughlin's murder in May 2009. Defendant's first argument is that the delay in filing this case resulted in a denial of right to due process.

a. *Background*

Both defendant and Packard moved to dismiss the prosecution because of the delay in charging them. Defendant argued the police dropped the ball during the initial murder investigation by failing to obtain copies of the records of his 8:52 p.m. telephone call in response to Tuomisto's page, and not interviewing witnesses or

6

obtaining documentation about when he and Packard left Walnut or when he arrived at the nightclub that evening. He claimed if this "evidence were available," it would have been "impossible for [him] to have arrived at McLaughlin's residence prior to 9:08 p.m." and thus, "the passage of time, the loss of records, and the failure of law enforcement to interview percipient witnesses or obtain records prevent[ed him] from presenting an independently corroborated alibi defense at trial." In supplemental briefings defendant named four other possible suspects and argued the delay compromised his ability to also establish a third party culpability defense. The prosecution opposed defendant's motion, arguing he failed to make the requisite showing of prejudice from the delay and that significant additional evidence discovered through its continuing investigation of the murder justified the delay.

The trial court issued a six-page order denying both motions without prejudice to refiling them in the event of a conviction. It noted the case against each defendant "was entirely circumstantial." On the issue of prejudice, the court found that, except for the documentation of defendant's phone call to Tuomisto, the assertions of lost or missing evidence "are at best speculative." As for the missing pay phone record, the court concluded its value was limited to "corroborating" defendant's claim he made the call. Further, its "loss . . . [wa]s as much, if not more attributable to [the defense] as it [wa]s the prosecution" because a defense investigator claimed he had a copy of a credit card receipt for the call "in early 1995" and thus "[defendant] w[as] in better position than the Newport Beach Police Department to secure" it. In addition, while there was evidence Tuomisto "no longer has any memory of the page," the court noted that when located in 2009, he gave a "statement" that "casts doubt on . . . [defendant's] alibi."

The court also concluded the 15-year lag in filing the murder charge resulted from "only investigative delay." There was no showing the prosecution either purposefully delayed filing the case or did so for a tactical purpose. In support of its ruling, the court noted it was not until after the cold case investigator was assigned to the

case that the prosecution discovered the identity of Cottrill and Cogar and first learned of Packard's effort to suppress knowledge of her association with defendant and his knowledge of where the front door key had been made.

During defendant's trial, the court allowed the defense to introduce evidence supporting defendant's alibi theory even though he did not take the stand and testify. Julian Bailey, an attorney defendant retained shortly after McLaughlin's murder, and James Box, Bailey's investigator, testified they saw the bill for defendant's December 15, 1994 pay phone call.

Box was also allowed to testify that in early 1995 he interviewed Tuomisto. According to Box, Tuomisto said he called defendant shortly before 9:00 p.m. on December 15 to recommend he leave early for work because there was heavy traffic due to the annual Newport Bay boat parade. Tuomisto also told Box that he saw defendant at the nightclub around 9:30 p.m.

Although Kevin died in 1999, the court allowed the defense to introduce a statement he made to the police the night of the murder. According to an investigator, Kevin initially told the police that it took him three minutes to call 9-1-1 after hearing the gunshots.

In addition, Box testified to statements he obtained from Rosemary Luxton, one of McLaughlin's neighbors at the time of the murder. By the time of trial, Luxton had also died. Luxton told Box that after hearing unusual popping sounds shortly after 9:00 p.m., she went out on her patio and looked in the direction of the walking path, but did not see any activity. Luxton claimed she was able to view that area because of the nearby holiday lights and the fact that it was a clear night with a full moon.

Finally Vandaveer, the locksmith who identified the key found in the McLaughlin front door as one he had made, admitted on cross-examination that he sold the key making machine he used to make the keys for defendant and lost track of it.

8

After trial, defendant renewed his motion to dismiss for precharging delay. The court denied it, declaring, "[n]othing at trial convince[d]" it "that the defendant was denied due process because of the delay in prosecution."

*b. Analysis*

The principles governing a claim of precharging delay are well settled. "The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging." (*People v. Cowan* (2010) 50 Cal.4th 401, 430; see *United States v. Lovasco* (1977) 431 U.S. 783, 789 [97 S.Ct. 2044, 52 L.Ed.2d 752].)

To justify dismissal for precharging delay, a defendant must show prejudice, i.e., the """"loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay."""" (*People v. Cowan, supra,* 50 Cal.4th at p. 430.) "'Prejudice . . . from precharging delay is not presumed.'" (*People v. Jones* (2013) 57 Cal.4th 899, 921.)

If a defendant satisfies this burden, the prosecution must show justification for the delay. "'[A]lthough "under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process,"'" where """"the delay was merely negligent, a greater showing of prejudice [is] required to establish a due process violation." . . . But if the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified.'" (*People v. Jones, supra,* 57 Cal.4th at p. 921.)

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]." (*People v. Cowan, supra,* 50

9

Cal.4th at p. 431.)  "In evaluating the correctness of a trial court's denial of a defendant's speedy trial motion, we consider all evidence that was before the court at the time the trial court ruled on the motion."  (*People v. Jones, supra,* 57 Cal.4th at p. 922.)

There was no abuse of discretion here.  As noted above, the trial court eliminated much of the alleged prejudice claimed by defendant when it allowed the defense to introduce otherwise inadmissible evidence; testimony from Bailey and Box on their belief they saw the phone bill for defendant's purported pay phone call, the statement Toumisto gave the defense investigator shortly after McLaughlin's murder, Kevin's initial estimate of the time it took for him to make the 9-1-1 call, and Luxton's statement she did not see any activity along the walking path just after hearing gunshots on the night McLaughlin was murdered.

Defendant's argument focuses on the fact the prosecution was allowed to blunt the force of the foregoing evidence through cross-examination and impeachment of the witnesses, and by even employing Luxton's statement to introduce damaging rebuttal testimony.  For example, the prosecutor cross-examined Bailey and Box at length on whether they actually saw or only thought they saw the phone bill listing a call on December 15, 1994.  But testing the knowledge, recollection, and credibility of a witness is one of the essential purposes of cross-examination.  (Evid. Code, § 780, subds., (c), (d) & (i); *People v. Guthreau* (1980) 102 Cal.App.3d 436, 445.)

In response to Tuomisto's statement, the prosecution presented evidence the boat parade did not begin until two days after McLaughlin's murder and thus, if Tuomisto did page defendant, it was on a later date.  Also the parties stipulated that if Tuomisto was called as a witness he would testify he currently has no recollection of ever calling or speaking with defendant and, due to the differences in their responsibilities at the nightclub, cannot think of any reason why he would have paged defendant.  As for the delay in Kevin's 9-1-1 call after hearing the gunshots, the prosecution introduced the testimony of his sisters, who later timed their brother walking from his bedroom to the

10

kitchen where the murder occurred. They testified he reached the kitchen in 52 seconds. Although defendant suggests Kevin's disabilities may have made it difficult for him to make a telephone call, one sister testified her brother "called people regularly and had no problem dialing the phone." And as for the statements Box obtained from Luxton, defendant complains the prosecution used her description of the sequence of shots to introduce rebuttal evidence that defendant had received training on the double-tap method of shooting a firearm. But all of this was proper rebuttal evidence. (*People v. Clark* (2011) 52 Cal.4th 856, 936 ["Rebuttal evidence is relevant and . . . admissible if it 'tend[s] to disprove a fact of consequence on which the defendant has introduced evidence'"].) Further none of defendant's complaints about the foregoing evidence is relevant to whether he suffered prejudice from the 15-year delay in charging him with McLaughlin's murder.

Defendant also complains about how the differences in traffic patterns between 1994 and the present might have affected the police investigators' time trials, and Vandaveer's sale of the key making machine. This argument amounts to only speculation which is not a basis for showing prejudice. (*Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, 947.)

Further, the prosecution presented evidence explaining the justification for the delay in filing charges against Packard and defendant; the recent discovery of the identities of Cottrill and Cogar, defendant's statement about the key left in the front door, and Packard's attempt to suppress the fact that defendant was with her on the night of the murder. "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. '[T]he necessity of allocating prosecutorial resources may cause delays . . . . Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay . . . .' [Citation.] It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher

11

priority or had done things a bit differently they would have solved the case sooner."
(*People v. Nelson* (2008) 43 Cal.4th 1242, 1256-1257.)

Defendant's reliance on *People v. Mirenda* (2009) 174 Cal.App.4th 1313 and *People v. Boysen* (2007) 165 Cal.App.4th 761 is unavailing. Each case involved the *affirmance* of a pretrial dismissal for precharging delay where the trial court found the defendant suffered prejudice and the prosecution failed to show adequate justification for not filing the case sooner. Here, the trial court applied the same balancing test as that used in *Mirenda* and *Boysen*, but found the evidence *failed to establish* the 15-year delay in this case resulted in a violation of defendant's right to due process. Based on the record we conclude the court did not abuse its discretion in so ruling.

## 2. Refusal to Discharge Juror

Defendant argues the trial court erred by not discharging a juror because of her comment on his courtroom demeanor, claiming it likely influenced her deliberation on his guilt.

### a. Background

During trial, the court received information from Juror No. 6 that he overheard Juror No. 1 tell an alternate juror that defendant "creeps her out." In counsel's presence, the court questioned all three jurors about the incident. Juror No. 6 repeated what he had heard. The alternate juror denied hearing Juror No. 1's statement. However, Juror No. 1 acknowledged she "said, 'I can't see [defendant] very clearly and maybe that's good because sometimes he looks creepy[,]'" and that she "was glad that he smiled occasionally, it brought him back to normal." Juror No. 1 explained, "I think maybe just because he looked so serious. It is a serious thing that he's going through. Like I said, I felt more comfortable when he smiled . . . ." Juror No. 1 also acknowledged "I shouldn't

12

have said that," and denied she was biased against defendant or had made up her mind about the case.

The court denied the defense's request to have Juror No. 1 discharged. "One thing the record doesn't reflect is her demeanor.  She was very apologetic.  I got the sense from her that she was genuine in her responses, especially her comments that 'seeing him smile helped a lot.  He seemed to be so serious.'"  After trial, the defense renewed the objection in a new trial motion, but the court again denied relief, finding Juror No. 1 "was competent to sit" on the case, noting its belief her comment only "meant that [defendant] was too serious and [he] should smile more."

### b. Analysis

Penal Code section 1089 authorizes a court to discharge a sitting juror "[i]f at any time, whether before or after the final submission of the case . . . , a juror . . . upon other good cause shown . . . is found to be unable to perform his or her duty . . . ."  Juror No. 1's comment on defendant's looks was inappropriate.  She had been told not to discuss the case and her comment on his appearance could be viewed as an indication she was biased.  Further, "'[i]t is misconduct for a juror to consider material [citation] extraneous to the record.'"  (*People v. Williams* (2006) 40 Cal.4th 287, 333; see *People v. Harris* (2013) 57 Cal.4th 804, 856.)  And, in a trial on the issue of guilt, "a defendant's nontestimonial conduct in the courtroom does not fall within the definition of 'relevant evidence' as that which 'tends logically, naturally, [or] by reasonable inference to prove or disprove a material issue' at trial."  (*People v. Garcia* (1984) 160 Cal.App.3d 82, 91, fn. omitted.)

But Juror No. 1 readily admitted what she had said and acknowledged it was wrong.  She insisted she had not yet formed an opinion on defendant's guilt.  And, immediately after questioning the three jurors about the incident, the court addressed the entire panel and repeated the admonition to not "have any discussions about the case, any

13

aspect of it."  We presume the jurors follow this instruction.  (*People v. Homick* (2012) 55 Cal.4th 816, 867; *People v. Yeoman* (2003) 31 Cal.4th 93, 138-139.)

Also, "'[b]efore an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a "demonstrable reality."  The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause . . . if supported by substantial evidence.  [Citation.]'"  (*People v. Jablonski* (2006) 37 Cal.4th 774, 807.)  This "test 'requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion . . . .'  [Citation.]  To determine whether the trial court's conclusion is 'manifestly supported by evidence on which the court actually relied,' we consider not just the evidence itself, but also the record of reasons the court provided.  [Citation.]  In doing so, we will not reweigh the evidence."  (*People v. Wilson* (2008) 43 Cal.4th 1, 26.)

This case involves a single statement by a juror, apparently heard by only one other juror, commenting on how defendant appeared when he did not smile.  Juror No. 1 readily acknowledged her comment was inappropriate, and stated she had not made up her mind on defendant's guilt and was not biased against him.

Defendant argues the record does not support the trial judge's finding Juror No. 1 was apologetic, citing her request for an adjustment of the seating to obtain a better view of defendant.  Under the applicable standard of review, we do not reweigh the evidence on this issue.  (*People v. Williams* (2013) 58 Cal.4th 197, 292.)  In addition, his interpretation of Juror No. 1's comments defies common sense.  If defendant's appearance "creeped [her] out," we can discern no reason why Juror No. 1 would ask that counsel be reseated so she could better view defendant.

Defendant also claims the trial court never told the jury that his courtroom demeanor could not be considered by them.  This assertion is incorrect.  When trial began, the court explained to the jury the forms of evidence included testimony,

14

documentary and physical evidence, and stipulations.  Again, after the evidentiary phase, the court instructed the jury to "decide what the facts are," "us[ing] only the evidence that was presented in this courtroom," i.e., "sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence."

Finally, defendant argues the failure to discharge Juror No. 1 violated his federal constitutional right to a fair and impartial jury.  But Penal Code "section 1089 'does not offend constitutional proscriptions[,]'" and "'our conclusion that the trial court did not violate that statute necessarily disposes of [defendant's] constitutional claim[].'" (*People v. Williams, supra,* 58 Cal.4th at p. 293.)

We conclude the trial court properly exercised its discretion in denying the request to remove Juror No. 1.


*3.  Exclusion of Evidence*

During cross-examination of one of the officers who questioned defendant in January 1995, defense counsel asked "is it fair to say that [defendant] appear[ed] surprised by the revelations that you're all telling him about [Packard] and . . . McLaughlin's relationship."  The prosecutor objected on the ground of speculation, but the court sustained the objection finding the question "overbroad." Defense counsel then asked, "in your observations of [defendant] when you were talking, did he appear to be surprised," but the court issued the same ruling.  On a third try, defense counsel asked if defendant "appeared to be learning something for the first time." Again, the court sustained an objection for the same reason.

Defendant claims the trial court's evidentiary rulings were error because the questions sought a proper lay opinion on whether he "appeared surprised at the revelation of Packard's romantic relationship with McLaughlin."  But as the Attorney General notes, defense counsel's questions failed to clarify that he was seeking defendant's

15

response to the officers' comments concerning the sexual nature of Packard's relationship with McLaughlin.

Also, as the Attorney General argues the testimony excluded by the court's rulings was cumulative at best. We agree. The jury heard a tape recording of the January 1995 interview and, even on a cold appellate record, it is clear defendant was surprised by what the officers were telling him.

For example, when the officers questioned defendant about his relationship with Packard, he responded, "I don't understand why my relationship with [her] would be scrutinized . . . . See this is where I'm baffled. [¶] . . . [¶] This is where you need maybe to fill me in." The officers told defendant Packard and McLaughlin "didn't have a platonic relationship," and he replied, "And you know this for a fact?" One officer then told him "they had a sexual relationship," defendant asked, "You sure?" and "Absolutely positive?" He admitted Packard "has never ever" told him about her sexual relationship with McLaughlin and the officers were the first "to tell me that there was a relationship between [Packard] and [McLaughlin]." Defendant also acknowledged "if . . . what you're telling me is true then she is pretty, pretty good at . . . [¶] . . . [¶] . . . hiding something."

Even assuming the court erred in sustaining the prosecution's objections, the error was clearly harmless. "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional . . . test" of "whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Defendant argues the error is of federal constitutional dimension because it denied him the opportunity to present a defense. Not so. The prospect that Packard had misled him about her relationship with McLaughlin was supported by Cogar's testimony that defendant wanted to blow up McLaughlin's plane because he was making unwanted sexual advances on Packard. Further, as just noted, the jury heard defendant's own voice expressing surprise at what he was told about

16

Packard's relationship with McLaughlin. Thus, it was not reasonably probable the admission of the officer's opinion testimony on this subject would lead to a more favorable verdict, nor did the exclusion of this evidence preclude defendant from presenting a defense.

*4. The Financial Gain Jury Instruction*

The court read to the jury the following instruction on the financial gain special circumstance allegation. "The defendant is charged with the special circumstance of murder for financial gain . . . . [¶] To prove that this special circumstance is true, the People must prove that: [¶] One, the defendant intended to kill. [¶] And, two, the killing was carried out for financial gain. [¶] Either the defendant or a third party may be the direct recipient of the financial gain. Financial gain can be either the primary or secondary purpose of the killing." This instruction was taken verbatim from CALCRIM No. 720 except for the last paragraph which was based on *People v. Michaels* (2002) 28 Cal.4th 486, 519-520 [financial gain special circumstance applies even if the murderer's primary purpose is to protect a third person and it was the third party who would receive the financial gain].

Defendant argues "the evidence" at trial "was . . . susceptible to an interpretation that [he] was not aware of Packard's [financial] motives," and, as given, the instruction was ambiguous because it failed to inform the jury of the subjective requirement he must be consciously aware that he was committing the murder at least in part for Packard's financial gain.

First, "[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request . . . , and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638; see *People v. Whalen* (2013) 56 Cal.4th 1, 81-82.) Defendant failed to ask the court to clarify the standard instruction.

17

Second, the last paragraph of the instruction, as given, answers defendant's complaint. "'"In reviewing [a] purportedly erroneous instruction[], 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' . . . "Additionally, we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]'" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1320-1321.) Here, the final paragraph informed the jury that financial gain must be a motivation for the murder, even if someone other than defendant was the beneficiary. Thus, even if defendant's primary reason for killing McLaughlin was to avenge what he believed were the victim's purported unwanted sexual advances, to find the special circumstance allegation true, the jury necessarily had to find he also knew Packard stood to financially benefit from the murder.

DISPOSITION

The judgment is affirmed.


RYLAARSDAM, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.

18